**CROSSEN et, Plaintiffs-Appellees, v. DUFFY et, Defendants-Appellants.**

Ohio Appeals, Seventh District, Columbiana County.

No. 689.   Decided June 11, 1951.

Tobin & Tobin, Lisbon, for plaintiff-appellees.
Brookes, Lynch & McDonald, East Liverpool, for defendants-appellants.

(SKEEL, PJ, HURD, J, THOMPSON, J, of the 8th District sitting by designation in the 7th District.)

## OPINION

By THOMPSON, J.:

This is the third case to come to this court growing out of

various internal controversies of the National Brotherhood of Operative Potters, an Ohio corporation. This case is being decided solely on the facts of this action, but the explanation of the instant case becomes clearer if we have in mind the other litigation.

The first case to reach this court was that of **Finlay et al v. Duffy et al, 57 Abs 442,** decided by this Court on May 19, 1950. In the Finlay case, the plaintiffs were certain members of the National Brotherhood of Operative Potters and the defendants were national officers of that Union. The membership of the Union comprises operative potters belonging to separate local unions scattered throughout the United States and Canada. These local unions, some 114 in number, with a local membership of more than 28,000 members, are affiliated with and under the jurisdiction of the National Brotherhood of Operative Potters. In the Finlay case, the plaintiff members had sought an injunction against certain salary increases of the national officers, claiming that the increases were unauthorized and in violation of the Constitution of the National Union and of its subordinate locals.

The petition was filed in the Common Pleas Court of Columbiana County and that court granted an injunction against the salary increases but this Court, on appeal on law and fact, reversed the trial court, holding that this Court would not substitute its judgment for that of those authorized to determine questions of policy and internal management of a voluntary association. This Court also stated, in reaching its decision, that the right to seek the power of injunctive relief in a court of equity cannot be invoked unless and until it is made to appear that a property right has been invaded for which there is no other adequate remedy afforded. The increased salary for the national officers had been voted by the Executive Board in early 1947. In May, 1947, a spirited campaign developed within the Union on the part of individual members (Finlay, Whippler et al) campaigning as a slate opposed to the then officers of the National Brotherhood. These members failed of nomination and the officers who for many years had guided the National Brotherhood policies were reelected at the Annual Convention in June, 1947. In that National Convention a resolution was introduced and passed by the delegates amending the Constitution. The language of the resolution was as follows:

"REPORT OF LAW COMMITTEE RECOMMENDATION

"Whereas, The Law Committee has been instructed to offer a solution for unethical tactics and conduct in the past election; and

"Whereas, The dignity of our organization has been lowered; therefore be it

"Resolved, That any member contesting for national office shall conduct himself in a proper manner; and be it further

"Resolved, That any member accused of making false accusations, misrepresentations, untruths or using degrading literature shall be called before the convention following said election, by a majority vote thereof.

"The succeeding convention could try accused member or members or elect a body of five members to try said accused, or set up a special court with power to impose a reprimand, fine, suspension or expulsion.

"Committee recommends adoption.

"Motion by John Thorne that we concur in the report of the committee. Motion carried unanimously."

Defendants' Exhibit 1 (Page 21)

Subsequently, in February of 1948, suit in the Common Pleas Court of Columbiana County was filed by Finlay and Whippler to enjoin the officers of the National Brotherhood of Operative Potters from receiving the salaries voted by the Executive Board. The Common Pleas Court granted the injunction in June, 1948. In July, 1948, the National Convention passed a resolution requiring exhaustion of intra-union remedies before resorting to court action to correct intra-union grievances. Subsequently, in the Autumn of 1948, the plaintiffs in the original court action in Common Pleas Court returned to that Court by supplemental petition and presented certain facts based on claims of newly discovered evidence, indicating fraudulent voting by local unions in connection with proposed salary increases to national officers. The Common Pleas Court rendered an opinion in April, 1949, continuing the injunction against salary increases for the officers and it was this decision that this Court reversed, as previously noted, in 57 Abs 442 (July, 1950). In March, 1949, in accordance with the Constitution of the National Brotherhood, the customary primary elections were held to select the national officers for the ensuing year and in May, 1949, run-off elections were held between the two highest candidates for each office at the primaries. In this May, 1949, election there was a slate known as the "Finlay Slate" opposing the then National Officers which we may refer to as the "Duffy Slate." The Finlay slate was unsuccessful.

In the contest in May, 1949, certain of the supporters of the Finlay slate had circulated a sheet referred to as the "Green Sheet" which is plaintiffs' Exhibit 7 in this case. The election campaign at the local union levels was decidedly spirited but the Duffy slate was successful. Subsequent to the 1949

Annual Convention and prior to the Annual National Convention to be held in June, 1950, certain of the candidates for office at the May, 1949 primaries and certain of their supporters who had backed them, and who had circulated what. is referred to as the "Green Sheet" received notices to appear for trial at the National Convention to be held in June, 1950. We shall return to a more specific statement of the facts concerning the action taken at the June, 1950 Convention, but at this point we may summarize the events by saying that the National Convention of 1950 tried and punished certain of the candidates for office at the May, 1949, primary and, also, tried and punished certain of their supporters who admitted that they had either signed or circulated the "Green Sheet" or handbill referred to as Plaintiff's Exhibit 7.

In August, 1950, Finlay and Whippler and various other candidates for national office at the May, 1949, primary, who had been punished by the National Convention in June, 1950, filed suit in the Common Pleas Court of Columbiana County (No. 37226) asking that Court to set aside their fines and suspensions. At the same time, a separate suit was filed in the same Court (No. 37227) by five members of the Union, the plaintiffs appellees in this action, none of whom were candidates for office at the May, 1949 primary, but all of whom had been punished at the June, 1950 National Convention because of their circulation of the handbill referred to as Plaintiffs' Exhibit 7, which had been used in support of the unsuccessful candidates.

We are, in this decision, in no way concerned with the court suit by the candidates for office and the sole question in this action is the question of the legality of the punishment imposed by the 1950 Convention against the five members of the union who merely circulated handbills in behalf of the unsuccessful slate at the May, 1949 primary.

In order to determine the nature of the action by these five individuals and in order to consider the punishment meted out to them and the relief which they are now requesting in court, a further examination of the facts in this case is required.

We have previously referred to and quoted the resolution adopted at the National Convention in June, 1947. That resolution in modified form, which modification was made by the national Secretary without the authority of a convention of the Brotherhood or a referendum of the members, became embodied in the Constitution of the National Union as revised October, 1947, and is therein set forth as Section 37. That section provides as follows:

"Any member of the N. B. of O. P. who is not a citizen of the United States or Canada shall not be eligible to hold any National Office. Any members contesting for national office shall conduct themselves in a proper manner. False accusations or misrepresentations, untruths, or use of degrading literature shall be brought to the attention of the delegates in Convention following the National election. Any candidate convicted by a majority vote of delegates in Convention, of enumerated practices may be reprimanded, fined, suspended or expelled after due and proper hearing. If the offending member candidate is not a delegate, the Convention shall by a majority vote elect a body of five members as a special court to hear the case, with power to fine, reprimand, suspend or expel."

It may be noted that Section 37 was perhaps intended as a condensation of the June, 1947 resolution, but comparison of Section 37 with the resolution shows one or two material differentiations. . Thus, the resolution by its words provides that "any member contesting for National office shall conduct himself in a proper manner." The resolution also declares that any member accused of making false accusations, misrepresentations, untruths or using degrading literature, shall be called before the Convention following said election by a majority vote thereof. The resolution then proceeds to declare that the succeeding convention could try any accused member or members or elect a body of five members to try them or set up a special court with power to impose a reprimand, fine, suspension or expulsion. Section 37 of the Constitution on the other hand provides that any members contesting for National office shall conduct themselves in a proper manner, and declares that "false accusations or misrepresentations, untruths or use of degrading literature" shall be brought to the attention of the delegates in the next Convention and then states that any candidate convicted by a majority vote of delegates may be reprimanded, fined, suspended or expelled after due and proper hearing.

Section 37 declares that if the offending member candidate is not a delegate, the Convention shall, by majority vote, elect a body of five members as a special court to hear the case.

In addition to Section 37 of the Constitution, it must be noted also that at the 1948 National Convention the following resolution was enacted:

"Recommendation of Law Committee:

"The Executive Board shall be empowered to summon any member or members before our National Convention for examination of any act or conduct in violation of their obli-

gation, or anything in any manner determental (detrimental) to the N. B. of O. P. and its members.

"The delegates in the Convention shall have authority to impose suitable and proper penalty in any case where guilt is established.

"Failure to present themselves shall not prevent the delegates from disposing of the case in accordance with letter and spirit of this law.

"If proven not guilty, the member or members shall be entitled to transportation and hotel expenses to be paid by the national organization.

"This law to become effective immediately.

"Committee recommends adoption.

"Motion by T. J. Desmond that we concur in the report of the committee. Motion carried unanimously."

Plaintiffs in this case are Crossen, Gilbert, Cranston, Hammond and Snyder. Of these five plaintiffs, the handbill (Plaintiffs' Exhibit 7) bears the names of three, namely, Gilbert, Cranston and Snyder, as members of a committee of six urging a change in national officers and setting forth as worthy of election the names of eight individuals which we refer to in this opinion as the Finlay slate. None of the plaintiffs in this case was a candidate on that slate, the offense charged against the plaintiffs in this case and for which they were tried, being that they either published or circulated improper campaign literature.

Prior to the June, 1949, Convention, each of the plaintiffs in this case had received a letter dated June 20, 1949. Gilbert, Cranston and Snyder received similar letters containing the following notice:

"Dear Sir and Brother:

"You are hereby summoned to appear in the National Convention, June 27, 9:30 a. m. Atlantic City Auditorium, Atlantic City, N. J. to defend yourself for the act of publishing malicious misrepresentations regarding present national officials in the last election.

"You are being charged with violating the law adopted in the 1947 Convention, prohibiting malicious political activity within the organization.

"You are to assume all expense in connection with your getting to Atlantic City. If proven guilty you will not be reimbursed for any expense whatsoever. If adjudged not guilty the N. B. O. P. will pay expenses. We remain,

Fraternally,

James M. Duffy, President

Chas. F. Jordan, Secretary-Treasurer"

The letters to Crossen and Hammond also summoned them

to appear at the National Convention on June 27, 1949 at Atlantic City, but these two individuals not having signed the handbill, they were summoned to appear to explain their conduct in distributing handbills to local union memberships during the recent election. The last paragraph of the letters to Crossen and Hammond contained the identical language contained in the last paragraph of the letters to Cranston, Gilbert and Snyder, informing them that they were to assume the expenses in getting to Atlantic City and advising them that if proven guilty they would not be reimbursed for any expenses incurred.

It becomes important now to examine the handbill, the publication or circulation of which gave rise to the charges in this case. We reproduce the handbill as follows:

"Election N. B. O. P. Officers First Meeting in May

VOTE

"We believe the present administration should be changed ————— because of its —————

"1. Reluctance to Accept Laws and Courts of U. S. A.

"2. Illegal Salary Increases.

"3. Arbitrary Disregard of Wishes and Opinions of Locals and Members.

"4. Unfair Election Tactics.

"5. Use of Potters Herald for Personal Propaganda Agency and to Impugn Motives and Attack Members.

"6. Inefficiency in Office.

"7. Denial of Help to W. Va. Federation of Labor in Efforts to Increase Silicosis Benefits.

"8. Duffy's Open Shop Attitude.

"RESTORE DEMOCRACY IN N. B. O. P.

"The following are Honest and Capable—ELECT

> PRESIDENT—LARRY FINLAY
> SEC. TREAS.—P. K. CALHOUN
> FIRST VICE—E. CURRY
> SECOND VICE—HAROLD WEST
> THIRD VICE—E. C. ARMSTRONG
> FIFTH VICE—VERNE PHILLIPS
> SEVENTH VICE—CHARLES BOSO
> EIGHTH VICE—GEORGE BRUNT
> > Committee:
> > NORMAN WHIPPLER—No. 124
> > E. CRANSTON—No. 9
> > FRANK APPLEGATE—No. 59
> > PAUL GILBERT—No. 33
> > H. SNYDER—No. 133
> > O. L. SULLIVAN—No. 201"

Plaintiffs' Exhibit 7

It should be added that in addition to the five plaintiffs in this case who were summoned to appear at the Convention, one other individual not a party to this suit, O. L. Sullivan, had his name on the handbill as a member of the Committee in behalf of the Finlay slate. The latter did not come to the Convention, but he wrote a letter stating his signature had appeared in the handbill without his authorization and he was exonerated by the National Convention.

At the National Convention which commenced on June 27, 1949, the Convention had a number of matters to dispose of and on July 5th, the Convention took up the matter of the alleged misconduct of Crossen, Gilbert, Cranston, Hammond and Snyder pursuant to the summons received by each. The proceedings of this Convention (Plaintiffs' Exhibit 2) thus summarized the action which then occurred as follows:

"The case of the next accused by the Executive Board for distributing malicious handbills in violation of the Constitution was taken up.

"Secretary-Treasurer Jordan read the accusation against Frank Applegate, Local Union 59, Norman Whippler, Local Union No. 124, Ed Cranston, Local Union No. 9, Paul Gilbert, Local Union No. 33, O. L. Sullivan, Local Union No. 201 and Henry Snyder, Local Union No. 133.

"Frank Applegate, Local Union No. 59, rose and stated that he wanted to go on record that he did not have anything to do with having his name on any handbills, but that he did distribute them because he believed they were true statements." * * *

"The prosecution stated their charge and rests their case on the presentation of the green document carrying the names of the following members: (Plaintiffs' Exhibit No. 7) Norman Whippler, Local Union No. 124, Ed Cranston, Local Union No. 9, Frank Applegate, Local Union No. 59, Paul Gilbert, Local Union No. 33, Henry Snyder, Local Union No. 133, O. L. Sullivan, Local Union No. 201.

"The photostatic copy of a letter sent Brother O. L. Sullivan, Local Union No. 201 from Norman Whippler, Local No. 124, was read for the record. Motion by Delegate Morgan, Local Union No. 89 that Brother Sullivan be exonerated in the misuse of his signature on the green sheet. Motion carried 108 to 24.

"Delegate Applegate, Local Union No. 59 pleads not guilty. I knew nothing of the use of my name until I saw it on the green sheet. Motion by Delegate Williams, Local Union No. 4, seconded by Delegate Blake of Local Union No. 172 we exonerate Brother Applegate, Local Union No. 59 of the use of his name on the green sheet. Motion carried 134 yes 3 no."

The proceedings of the Convention further show that by resolution subsequently adopted, after hearing, a fine of $50.00 was assessed against Gilbert, Cranston and Snyder for putting their names to the green sheet, subject to appeal to the Executive Board. As to the charge of distributing literature on the part of Crossen and Hammond, the fine was originally fixed at $50.00, but the fine as to Crossen was at a later point in the Convention suspended and he was placed on four years probation.

This modification as to Crossen was apparently the result of a statement attributed to Crossen at the Convention and carried in the printed proceedings in which he declared, "I am willing to rub off the war paint and co-operate 100%."

Thereafter, letters were written to each of the five individuals found guilty by the Convention, advising them of the $50.00 fine. As to Crossen, it was declared that his fine was suspended and he was placed on probation for four years. As to the other four individuals, letters informed them of the fine in the amount of $50.00 each and stated that the fine would be suspended if the individuals appeared before the National Executive Board and gave satisfactory explanation of their recent conduct and assurances of good conduct in the future. The letter closed as follows:

"You must however, satisfy the Executive Board in your explanation before the fine is suspended. The fine must be paid to the National Secretary."

Under date of September 2, 1949, Gilbert, Cranston, Snyder, Crossen and Hammond filed their petition in the Common Pleas Court of Columbiana County naming as defendants, the National President and the National Secretary of the Union in their individual capacities and as officers of the Union. Plaintiffs alleged that they were members in good standing of the Union, having paid all dues and assessments required by law and regulations of the Union. They recited the fact that in May, 1949, an election for national officers was held by the National Union in which the defendants were candidates for election to the office of National President and National Secretary. Plaintiffs further alleged that the said defendants were opposed by another slate of candidates headed by one L. A. Finlay, and that plaintiffs had campaigned to advance the cause of the slate headed by Finlay. Plaintiffs further alleged that they distributed literature in behalf of the Finlay slate, that their slate lost in the election and that the defendants Duffy and Jordan were re-elected to the office of National President and National Secretary. The

petition then recited that plaintiffs were thereafter ordered by defendants to appear at the National Convention of the Brotherhood to be held on June 25, 1949 at Atlantic City, New Jersey and to stand trial. Plaintiffs further recited that at said Convention, and regardless of whether plaintiffs were present or not at the Convention, charges were brought against them for having campaigned against the slate headed by the defendants. Plaintiffs alleged that at no time did they submit to the trial, but that nevertheless each of plaintiffs, with the exception of Crossen, was assessed a fine of $50.00 and that plaintiff, Crossen, was placed on four years' probation. Plaintiffs further alleged that under the rules and regulations of the National Union, the payment of the fine was required to be made, the same as dues, and that if not paid, plaintiffs would be suspended from their local unions and from the National Union thus preventing them from being bona fide members of the Union and endangering their ability to pursue their trade. Plaintiffs further alleged that because of the fines assessed against them, the good standing of plaintiffs was thereby taken from them, making them ineligible under union rules to run for any office or to hold any office in the National Brotherhood or in the local unions for a period of five years. Plaintiffs further alleged that any literature distributed by them was merely to enhance the cause of the Finlay slate, which they were advocating, and they denied that they had distributed any literature of a degrading, malicious or vicious nature such as to cast disrespect upon the National Union. Plaintiffs further alleged that the defendants had presented charges and acted as prosecutor before the Convention in June, 1949, to punish plaintiffs for campaigning against them and to prevent any further activities of plaintiffs, by placing plaintiffs in a position where they would not be in good standing in their unions. Plaintiffs further alleged in their petition that the various offices for which they could run, including that of delegate to wage conferences, were valuable property rights, that their good standing in the Union was a valuable property right and that plaintiffs lacked adequate remedy at law. Plaintiffs, therefore, prayed the Court to restrain the defendants from enforcement of the penalties meted out to the plaintiffs at the Convention of 1949 and for such other and further relief as might be just and proper.

The defendants in their answer admitted that at the Annual Convention of the Union in 1949, the plaintiffs were summoned to appear on charges brought against them for conducting a campaign for National Officers of the Brotherhood

in a manner contrary to the Constitution and for the act of distributing hand-bills to union members or for publishing malicious representations regarding the National Officers. The defendants in their answer further averred that the charges against plaintiffs, the trial by the Convention and the findings were in accordance with the provisions of the Constitution, rules, regulations, custom and usage of the National Brotherhood of Operative Potters. The answer set forth the allegation that the action of the Convention was in accordance with, and pursuant to, the Constitution and expressly quoted the resolution of July 7, 1948, as authority for the action taken. Defendants asserted that the plaintiffs were found guilty of conducting or causing to be conducted a campaign for national officers in a manner in direct violation of the Constitution of the Union.

In their reply, the plaintiffs denied that they had published or distributed handbills containing malicious representations regarding the national officers and denied the other allegations of the answer.

On the hearing of this case in the Common Pleas Court, the testimony of the various witnesses called by plaintiffs and defendants consisted primarily of the narration of the events surrounding the trial of plaintiffs in the National Convention in 1949. The trial court was advised of the evidence proffered against the plaintiffs at that time and numerous exhibits were introduced, consisting of the Constitution and By-Laws of the Union, the charges against the plaintiff contained in the letters summoning them to the trial before the Convention, various issues of The Potters Herald, the Union newspaper published under authority of the national officers and the campaign literature distributed by the opposition slate including two copies of the Potters News and the so-called "green sheet" (Plaintiffs' Exhibit 7) which we have hereinabove reproduced.

The testimony of the defendant, Jordan, the National Secretary-Treasurer made it clear that the only evidence presented at the Convention against plaintiffs Gilbert, Snyder and Cranston was that their names were signed to the "green sheet" (Plaintiffs' Exhibit 7) and that they had ordered the distribution of it. Jordan further stated that none of these three men was present in person at the Convention.

As to plaintiffs Crossen and Hammond, neither signed plaintiffs' Exhibit 7, and Hammond was not present at the Convention but there was testimony that both had helped to circulate plaintiffs' Exhibit 7, and possibly also, plaintiffs' Exhibits 10 and 11.

It is apparent from the proceedings of the Convention and the testimony of defendants Duffy and Jordan that plaintiffs' Exhibit 7 was the particular literature to which objection was taken and which furnished the basis for the charges against plaintiffs and trial by the Convention.

The trial court, after analyzing the eight charges contained in plaintiffs' Exhibit 7, came to the conclusion that to punish plaintiffs for publishing and distributing the handbill in question, as the Convention attempted to do, interfered with the plaintiffs' freedom of speech and freedom of the press.

In its journal entry, the trial court declared as follows:

"The Court finds that a labor union does have a right to protect itself and its members from slander or libel; the Court further finds that a labor union does not have the right to abridge the freedom of speech or the press of its members; that the literature sponsored or passed out by the plaintiffs George Crossen, Paul Gilbert and Edward Cranston, Raymond Hammond and Harry Snyder, did not amount to slander nor libel and that any punishment that the defendants will mete out to the plaintiffs for sponsoring and passing out the literature introduced in this case would be an abridgement of the freedom of speech and press."

The Court found that none of the plaintiffs, with the exception of Crossen, consented to be tried by the 1949 Convention and that Crossen consented to accept probation at the hands of the Convention.

As to plaintiffs Gilbert, Cranston, Hammond and Snyder, the trial court held that the action of the 1949 Convention in trying these men, and imposing penalties upon them, was void and of no effect and the court therefore enjoined the defendants, Duffy and Jordan, individually and as President and secretary of the National Brotherhood and also, the National Brotherhood from collecting or attempting to collect the fines imposed upon plaintiffs. The injunction was denied only as to plaintiff, Crossen. The court found that under the Constitution of the Union, failure to pay a fine would subject the members involved to suspension from membership and consequent loss of property rights.

As a result of the appeal on law and fact to this Court by the defendants Duffy and Jordan from the trial court's judgment, this Court has studied carefully the evidence in this case, including the analysis by the trial court of the eight charges published or distributed by plaintiffs in the handbill referred to as plaintiffs' Exhibit 7. We do not find that any of these charges falls within the classification of libel. It seems to us rather that the charges complained of fall within the scope of free, if not fair, criticism and the

free speech guaranteed by the United States Constitution and the Constitution of Ohio. It is admitted that plaintiffs' Exhibit 7 was circulated as part of an election contest in behalf of one of two slates of national officers being presented for election, and to be voted on by the constituent local unions. The slate advocated in plaintiffs' Exhibit 7 failed of election. Each slate was warmly espoused by adherents and, in turn, strongly attacked by its opponents. Defendants, as national officers seeking re-election, had available channels of publicity not open to the slate advocated by plaintiffs, since the defendant President was editor of the official newspaper of the Brotherhood sent to all members, and the columns of that paper understandably advocated the defendants' slate and vigorously criticized the opposition, terming these individuals "smear artists," and otherwise belittling them.

In reaching our decision, we recognize that the National Brotherhood of Operative Potters is a strong union, a democratic union. Its record for successful leadership in the industrial field has been outstanding. A strong organization pre-supposes strong leadership. Such leadership calls forth strong adherents and often strong critics and lively contests, not to be found, because not tolerated, in a totalitarian climate. In our political democracy and in our economic achievements a measure of our strength in this country has been our ability to permit, and benefit by, criticism and the competition which nurtures that strength.

The important and apparently original legal question squarely presented in this case is whether a rule adopted by a mutual benefit association of the character of a labor union may infringe upon and take away fundamental liberties otherwise granted by the Constitution of the United States and the Ohio Constitution. It is quite true that by joining a mutual benefit association an individual consents to be bound as a member by rules and regulations not affecting non-members. How far may a mutual benefit association go in restricting the freedom of members? In this case, the Association involved is an Ohio corporation and it is subject to the Constitution of Ohio and the Constitution and laws of the United States. The Constitution of the United States (Amendment I) declares that Congress shall make no law "abridging the freedom of speech, or of the press." The **Constitution of Ohio (Article I, Sec 11)** declares as follows:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

Having in mind the foregoing safe-guards, we may consider the provisions of the regulation or by-law, if any, which the plaintiffs in this case may be said to have violated. Examination of Section 37 of the Constitution of the Union as revised in October, 1947, shows that despite the language of the summons to the Convention, plaintiffs could not have been properly tried for violation of Section 37 because it applies only to candidates. Plaintiffs were likewise not properly able to be tried under the resolution of June, 1947, because, under the procedure there outlined, any member accused of making false accusations, misrepresentations, untruths, or using degrading literature, could be called before the Convention following the election, but could be tried only by the **succeeding** Convention, or by a body of five members or by a special court selected at such succeeding Convention.

We find that despite the letter calling plaintiffs to appear before the June, 1949, Convention to defend themselves for "the act of publishing malicious representations regarding present national officers in the last election," as in the case of Cranston, Gilbert and Snyder, or to explain their conduct, "in distributing handbills to local union memberships during the recent election for National Officials," as in the case of Crossen and Hammond, the plaintiffs were actually tried or able to be tried by the June, 1949, Convention only for violation of the resolution adopted at the July, 1948, Convention covering "conduct in violation of their obligation or anything in any manner determental to the N. B. O. P. and its members." We are loathe to say, in view of the provisions of the Constitution of the United States and the state of Ohio, guaranteeing free speech, that we should construe this indefinite language as intending to deprive members of the union of the right of free and fair criticism, otherwise theirs, although the 1949 Convention appears thus to have construed it and to have punished plaintiffs on that basis. Examination of the facts before us impels us to hold that a member of a mutual benefit association continues to be a citizen of the United States, and the free speech guaranteed by the United States Constitution permits freedom in criticizing his union officials, as well as his public officials generally, subject always to the limitations imposed by the laws of slander and libel. 64 Harvard Law Review 1071. In so declaring, we recognize that it is not generally the function of courts to control the policies or the internal affairs of labor unions, but the courts may and should protect the democratic processes within unions by which union policies and their leaders are determined. Upon this point, see the illuminating article entitled "Legal Limita-

tions On Union Discipline" by Clyde W. Summers, 64 Harvard Law Review 1049, at page 1073 and also, the article by Joseph Kovner entitled "The Legal Protection Of Civil Liberties Within Unions," Wisconsin Law Review (1948), at page 18.

Particularly important seems to us the realization that labor unions constitute a special type of mutual benefit association, standing in special relation to their members and to the state. Membership has become a frequent condition of employment, even as the right of every man to work has become increasingly recognized as one of the most valued rights of a free society. Viewing the important role of labor unions in this era, a court may well determine in a particular case that protection of their democratic processes is essential to the maintenance of our democratic government.

The right of free criticism of union officials was recognized in the recent case of Ames v. Dubinsky, 70 N. Y. S. (2nd) 706. The eleventh paragraph of the syllabus announces the following proposition—

"Where a person offers himself as a candidate for office in a union or for re-election, his character for honesty and integrity and his qualifications and fitness for the office are presented as suggestions for fair comment by contrast, comparison or analysis."

See also, Polin v. Kaplan, 257 N. Y. 277.

In Gleeson v. Conrad, 81 N. Y. S. (2nd) 368, it was held that courts will examine into the internal problems of unions and other associations when the rules of the organization have not been substantially complied with and a member has been damaged by such non-compliance or where the rules are themselves unreasonable or contrary to law or public policy.

We hold that the action of the 1949 Convention in fining plaintiffs because of publication or distribution of the handbills constituted an infringement of the right of free speech on the part of plaintiffs, calling for exercise, under the peculiar circumstances of this case, of the equity powers of this Court to protect the plaintiffs in their property rights and in their calling. In so declaring, we consider that we are in no wise departing from previous decisions of this Court including **Pfoh v. Whitney, 43 Abs 417,** decided by this Court on June 25, 1945, and **Finlay v. Duffy, 57 Abs 442,** this Courts' decision of May 19, 1950. It is our belief that our present ruling is a logical development of these two cases.

It is to be noted that in the Pfoh case there was no claim asserted by plaintiff that the section of the Constitution of the Union, on the basis of which plaintiff was expelled, was violative of the laws of the land or that it was not a valid part of the Union's Constitution.

In the Finlay case, the opinion declared that courts will not assume to act in place of those authorized to interpret the Constitution and by-laws of voluntary associations unless those, upon whom the duty is placed, act in an arbitrary and unreasonable manner. The precise question in that case involved the regularity of adoption of a resolution determining the compensation of the national officers and Judge Skeel, in rendering the opinion of the court, expressly pointed out that this matter in no way affected a property right of any of the members. In the opinion, Judge Skeel stated: "The right to seek the power of injunctive relief in a court of equity cannot be invoked unless and until it is made to appear that a property right has been invaded for which there is no other adequate remedy afforded."

In the present case, we find that a property right on the part of plaintiffs is clearly involved, since failure within thirty days to pay the fines levied would subject plaintiffs under Section 181 of the Union's Constitution to suspension from the Union. Furthermore, by Section 255 failure to pay a fine expressly deprives any member of all privileges of local membership thus entailing loss of benefits, loss of right to seek office within the Union and possible loss of work opportunities.

Numerous cases hold that where the expulsion or suspension of a member of the Union affects the individual's property rights, a court of equity will award relief to a member wrongfully expelled or suspended from the Union by decreeing his re-instatement, at least where a resort to the internal remedies within the union would be futile, illusory or useless, or would not accord to the members in question substantial or practical justice. See the note in 168 A. L. R. 1462 entitled "Exhaustion of Remedies Within Labor Union As Condition Of Resort To Civil Courts By Expelled Or Suspended Member" and particularly the cases cited at page 1479.

In the court below, the trial judge in his opinion pointed out that the matter of exhaustion of remedies within the Union is not a required pre-requisite to court action unless the tribunal is impartial, and in this case it was the Executive Board which brought the charges against plaintiffs and further appeal to that Board would presumably be unavailing. Particularly, was any such gesture to be deemed futile where the objectionable actions of plaintiffs constituted support of an opposition slate and where, in the companion case being decided by this Court today and involving attempted punishment of candidates on the rival slate, the action of the Executive Board had given evidence of intention of silencing further opposition.

Finding that plaintiffs exhausted their remedies within the Union, to the extent feasible, and finding that plaintiffs' property rights were involved, we therefore conclude that the injunction prayed for should issue against the defendants in favor of the five plaintiffs in this case.

Injunction granted. Exceptions. Order See Journal.

SKEEL, PJ, HURD, J, concur.