Alfred JOHNSON and Robert J. Jensen,
Appellants,

v.

Lester R. NELSON, L. Boerebach, C. H.
Bunkholt, Gunnar Peterson, E. H. Ever-
etts, Ralph Hallberg, Harry Burns and
Vern Thomay, Appellees.

No. 17298.

United States Court of Appeals
Eighth Circuit.

Dec. 31, 1963.

Herbert S. Thatcher, Washington, D. C., for appellants; Francis X. Helgeson, Minneapolis, Minn., with him on the brief.

James C. O'Neill, St. Paul, Minn., for appellees; Bundlie, Kelley & Torrison, St. Paul, Minn., with him on the brief.

Before VOGEL, MATTHES and ME-HAFFY, Circuit Judges.

MATTHES, Circuit Judge.

This action was instituted by eight members (appellees) of Local No. 386 (Local) of the Brotherhood of Painters, Decorators and Paperhangers of America, AFL-CIO, against Alfred Johnson and Robert J. Jensen (appellants), Local's president and treasurer, respectively, under Title V—§ 501(a) and (b) of the Labor-Management Reporting and Disclosure Act, (LMRDA) of 1959, 29 U.S. C.A. § 501(a) and (b) (commonly referred to as the Landrum-Griffin Act).[1] In brief, the complaint alleged that appellants as officers of Local, occupied positions of trust and that their refusal to sign checks in payment of certain attorneys' fees and other expenses which had been approved by the membership of Local, constituted a violation of their fiduciary obligations.

After a trial, the court, Judge Larson, found the issues for appellees and entered a judgment directing appellants to "prepare, execute, and deliver, forthwith, checks in full payment of the duly approved bills reimbursing Petitioners [appellees] for their attorneys' fees and related expenses. * * *" Appellants duly appealed from the judgment so entered.

The facts are uncontroverted, and inasmuch as they are exhaustively detailed in the trial court's findings, D.C., 212 F.Supp. 233, 236–240 (1963), it is neither necessary nor desirable that we indulge in another complete recital of them. A concise résumé will suffice.

Local has approximately 2200 members. Under the constitution of the International Union, seven members in good standing constitute a quorum for a meet-

---

1. § 501(a) provides in part:

"The officers * * * and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization * * *. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

§ 501(b) provides the jurisdictional base for institution of an action by a union member against an officer or other representative for alleged violation of § 501 (a). Since no question regarding the § 501(b) requirements for institution of such an action is raised on appeal, we need not set forth the subsection here.

ing. Bills for expenses incurred must be approved first by the trustees and then by the membership of Local before payment. The president and treasurer are required to sign checks in payment of approved bills.

Strong differences of opinion existed within Local regarding wage negotiations being conducted by incumbent officers; appellees and certain other members manifested their intention to present a slate of candidates to oppose appellants and other incumbent officers; at the nomination meeting, before appellees had nominated their opposition candidates, charges alleging violation of various union principles were preferred against appellees and others (most were opposition candidates) by one Carlson, the incumbent business agent of Local; a union trial was conducted by a Trial Board of which appellant Johnson was chairman. After three accused members were properly tried and acquitted, different trial procedures—in violation of the union constitution—were adopted by the Trial Board, and the accused members were presumed to be guilty instead of innocent of the charges. Under the new procedures, the remaining accused members were tried, found guilty, and either fined or suspended. On appeal, despite obvious violations of the rights of appellees, the International Union affirmed the "unlawful" action of the Local Trial Board.

Appellees instituted an action in the United States District Court for the District of Minnesota, charging appellants and others with violation of Title I—§ 101(a) (2) and (5) of LMRDA, 29 U.S.C.A. § 411(a) (2) and (5),[2] and seeking to set aside the improper disciplinary action. After the court (Judge Devitt) granted a temporary injunction, the parties entered into a stipulation approved by the court whereby the decisions of the Local Trial Board and the penalties imposed by that tribunal were set aside and withdrawn.

Appellees incurred attorneys' fees in the amount of $3,475 in the federal court action and costs in the amount of $262.44 in the first union trials.

At a meeting the membership of Local approved payment of appellees' attorneys' fees incurred in the federal court action, but at a subsequent meeting rescinded this action.

In May, 1961, Carlson filed new charges against "various Petitioners [appellees] and other members." Pursuant to the stipulation between the parties in the federal court case, the membership of Local elected a Special Trial Board to hear these charges. Appellee Nelson was the first accused to be tried. After trial but before the Special Trial Board had reported its decision to the membership, a representative of the International Union recommended a settlement of all issues to the Special Trial Board, including the payment of all attorneys' fees and expenses for both groups.

Thereafter, the Special Trial Board dismissed the charges against appellee Nelson and recommended that the attorneys' fees and expenses incurred by all parties in the two series of union trials and in the first federal court action be paid by Local. The membership of Local approved the recommendation of the Board. However, on August 18, 1961, in response to a letter from acting Local treasurer Romine, the General President

2. § 411(a) (2) provides in part:

"Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings * * *."

§ 411(a) (5) provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

of International suggested that payment of attorneys' fees incurred by appellees be deferred until investigation had been made. During a union meeting on August 21, 1961, appellant Johnson unsuccessfully attempted to rescind the prior approval by Local of the Special Board's recommendation. Johnson then submitted to the membership the vouchers of appellees, item by item, for attorneys' fees and other expenses incurred in the federal court action, and the membership approved each item.

On September 4, 1961, Johnson by letter requested an order from the International President directing Johnson not to pay the questioned bills. On September 6 and September 13, the officers of Local by unanimous vote (appellants abstaining) directed appellants to pay the bills. Appellants persisted in their refusal to do so.

On September 29, 1961, Romine and appellants were advised by the General President of International that investigation had been completed and that "in our opinion" appellees' bills and expenses were "individual indebtedness of these members" and should not be paid by Local. Appellees were not contacted during this "investigation". The letter further advised that there was no objection to payment of attorneys' fees for the union trials.

At a meeting of Local on October 2, 1961, appellees' attorneys requested Local's officers, pursuant to Title V—§ 501 (b) of the LMRDA, 29 U.S.C.A. § 501 (b), to take corrective or remedial action against appellants, or else appellees would themselves commence action. Appellants advised appellees to proceed, and this action was instituted on October 16, 1961.

On November 15, 1961, the General Executive Board (GEB) of International unilaterally, on its own motion, determined that the action of Local in approving the recommendations of the Trial Board respecting payment of appellees' bills was null and ineffective. The GEB suggested that the membership of Local reconsider its authorization of reimbursement "for the reasons: (1) that it is against the general policy of the Brotherhood to sanction expenditure of local union funds for such purposes and, (2) the expenditure of such funds for such purposes might well constitute a violation of Title V of the Landrum-Griffin Act." The GEB further advised that if the Local nevertheless decided to conduct a vote on the question, the Local should take such vote by *secret* ballot referendum vote of the *entire* membership by *mail*. No union constitutional provisions were cited as authority for the determinations made by the GEB.

There are two basic questions presented for our consideration and determination. (1) the scope of Title V—§ 501 of the Act, 29 U.S.C.A. § 501; (2) whether the conduct of appellants constitutes a violation of their fiduciary responsibilities and duties under Title V—§ 501.

In summary, appellants' position as to question (1) is that Title V of the Landrum-Griffin Act was designed to apply to situations where the action or non-action of union officials results in some *pecuniary* loss or disallowance to the membership as a group, and that the trust relationship imposed by Title V relates to financial or money-related responsibilities rather than to a broad "trustee" responsibility in regard to all activities and relationships between the officers of a union and the membership.

Careful analysis of Title V refutes the notion that the statute is narrow in its terms and scope and that it is limited solely to pecuniary responsibilities or the proper or improper use of union funds.

In explicit language, § 501(a) provides that officers and other representatives of a labor organization "occupy positions of trust in relation to such organization and its members as a group." It is the duty of each such person, "taking into account the special problems and functions of a labor organization," not only to hold its money and property solely for the benefit of the organization and its members, but to "refrain from dealing with such organization as an adverse party * * *

in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization."

■ Thus it plainly appears that the statute is broad in its reach. Officers and other union representatives may not act adversely to their organization or to the members as a group, or acquire a personal interest which is contrary to the interests of the organization. Being trustees the officers must subvert their own personal interests to the lawful mandates and orders of the organization.

The legislative history of the Act demonstrates that Congress intended that it should not be interpreted by the courts narrowly or strictly, but, to the contrary, that its confines are broad. Such history was painstakingly reviewed by Judge Larson in his opinion below, and appears in full, in two volumes published by the N.L.R.B. entitled "Legislative History of the Labor-Management Reporting and Disclosure Act of 1959." See also United States Code Congressional and Administrative News, 86 Cong. 1 Sess., 1959, Vol. 2, pp. 2318–2514. For purposes of this opinion, it is sufficient to give attention to that portion of H.Rep. No. 741 on H.R. 8342 appearing in Vol. 1, Legis.Hist. of LMRDA, p. 839, and in United States Code Congressional and Administrative News, 86 Cong. 1 Sess., 1959, Vol. 2, pp. 2479–2480. Before so doing, we note, as did Judge Larson in detail, 212 F.Supp. at 285, that H.Rep. No. 741 on H.R. 8342—known as the Elliott Bill—contained fiduciary provisions *identical* with those which became § 501(a) of the Landrum-Griffin Act.

The report in pertinent part provides:

"Union officials occupy positions of trust. They hold property of the union and manage its affairs on behalf of the members. It is the duty of union officers just as it is the duty of all similar trustees to put their obligations to the union and its members ahead of any personal interest.

\* \* \* \* \* \*

"We affirm that the committee bill is broader and stronger than the provisions of S. 1555 which relate to fiduciary responsibilities. S. 1555 applied the fiduciary principle to union officials only in their handling of 'money or other property' (see S. 1555, sec. 610), apparently leaving other questions to the common law of the several States. Although the common law covers the matter, we considered it important to write the fiduciary principle explicitly into Federal labor legislation. *Accordingly the committee bill extends the fiduciary principle to all the activities of union officials and other union agents or representatives.*" (Emphasis supplied).

The courts have with consistency refused to accede to the contention that § 501 is designed for the single purpose of establishing responsibility on the part of officers and other representatives in relation to the handling and managing of fiscal matters of the labor organization. Quite to the contrary, indication is clearly present in the reported cases that § 501 should receive a broad and liberal interpretation and application.

In Highway Truck Drivers and Helpers Local 107 v. Cohen, E.D.Pa., 182 F. Supp. 608 (1960), aff'd 284 F.2d 162 (3 Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961), the court made this pronouncement:

"Section 501, with which we are particularly concerned, is entitled 'Fiduciary responsibility of officers of labor organizations.' This section, quoted earlier, attempts to define in the broadest terms possible the duty which the new federal law imposes upon a union official. Congress made no attempt to 'codify' the law in this area. It appears evident to us that they intended the federal courts to fashion a new federal labor law in this area, in much the same way that the federal courts have fashioned a new substantive

law of collective bargaining contracts under § 301(a) of the Taft-Hartley Act, 29 U.S.C.A. § 185(a). See Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972." 182 F.Supp. at 617.

In Moschetta v. Cross, D.D.C., 48 LR RM 2669 (July, 1961), the court held that the right of the membership to a special convention had accrued and that the failure and refusal of the executive board and of the international officers to complete arrangements for and call a special convention was not authorized by the union constitution and constituted a breach of fiduciary duty under § 501. The court cited with approval Crocker v. Weil, 227 Or. 260, 361 P.2d 1014, 48 LRRM 2177 (1961). Compare also Holdeman v. Sheldon, S.D.N.Y., 204 F.Supp. 890 (1962), aff'd, 311 F.2d 2 (2 Cir. 1962).

In summary, we hold that § 501 imposes fiduciary responsibility in its broadest application and is not confined in its scope to union officials only in their handling of money and property affairs.

Appellants' second contention—that even if Title V imposes a fiduciary responsibility in the broadest sense, the action complained of would not constitute a violation of such responsibility—has given rise to certain misapprehensions that are in need of clarification. Appellants have seemingly misconstrued the true nature of this action, have diverted attention away from themselves as *local* officers, have attempted to focus upon the directive of the *International* General Executive Board reinforcing appellants' action, and have stated the issues in terms of a mere ministerial policy determination controversy between the International and the Local union members —thereby attempting to bring the case within the dictates of Parks v. International Brotherhood of Electrical Workers, 4 Cir., 314 F.2d 886 (1963), cert. denied, 372 U.S. 976, 83 S.Ct. 1111, 10

L.Ed.2d 142 (1963). Appellants assert that:

"the policy directive of the General Executive Board—found by the court below to be the basis for its ultimate determination against appellants—goes only to a requirement that any use of local union funds for the payment of legal expenses incurred in private litigation in which it was sought to protect the rights of such individual members must be submitted to a vote of the membership *as a whole* before such payments could be permitted as a matter of general policy. There was no attempt to discipline members who had brought such litigation merely because of their resort to the courts; all that was required was that repayment of expenses be agreed to by a majority of *all* whose funds were to be used for that purpose. * * * While it may be true that Landrum-Griffin protects the rights of individuals to seek relief for vindication of their rights, it cannot be said that any portion of Landrum-Griffin requires that individual members be given reimbursement by their local union for any costs that they might have incurred in defense of their rights.

* * * * * *

"[T]he policy determination which the General Executive Board was authorized to make was consistent with and guided by the provisions of * * * the International Constitution which prohibit loaning or donating money from the local union treasury to members. * * *

* * * * *

"In union affairs, personality clashes are the order of the day; it takes no imagination to conclude that the courts will be flooded with litigation if Title V has a scope and application, as found below, sufficient to permit the courts to question every policy determination made by

the governing body of a parent international union." (Emphasis supplied).

But the International is not a party to this action and its directive was considered below only for the purpose of determining whether it afforded appellants a valid reason for violating their fiduciary duty under Title V in not paying the bills as ordered by the duly authorized majority vote of the Local members. The trial court struck down the International directive, finding that it conflicted with Congressional policy as established in Title I of the Landrum-Griffin Act by discouraging the Local members from resorting "to the federal courts when internal redress for patent federal wrongs has proven futile in the past."

"This case nominally involves the alleged breach of a fiduciary duty and the non-payment of attorneys' fees, but what is really at stake here are the rights which were jeopardized by the union trials of July, 1960." 212 F.Supp. at 256.

In essence, this controversy narrows down to the following factual features: (1) Appellees—as revealed in the findings of fact below—were denied Title I rights in internal union trials, which culminated after much local internal union strife in which appellees had dared to express opposition to the incumbent local officers (appellants). In their brief, appellants "take no exception to the formal findings of fact made by Judge Larson and as otherwise set forth in his opinion," thereby conceding such treatment of appellees during the union trials as their presumption of guilt—in violation of the procedures set forth in the union constitution; (2) Despite the obvious violations by the Local Trial Board of the trial procedures and rights of appellees as set forth in the union constitution, the International Union affirmed the unlawful action of the Local Trial Board in suspending and fining appellees; (3) Charging violation of Title I—§ 101(a) (2) and (5) of the LMRDA, 29 U.S.C.A. § 411(a) (2) and (5), appellees sought to set aside the improper disciplinary awards in federal court. By stipulation approved and adjudged binding by the court, the decisions of guilt made by the Local Trial Board and the penalties imposed thereby were set aside and withdrawn; (4) After further local internal strife over payment of attorneys' fees incurred by appellees in their Title I action, and after further charges were levied against appellees, a Special Trial Board, constituted pursuant to stipulation entered into in the first federal court action, dismissed the charges against appellee Nelson, reprimanded both groups, and recommended that the attorneys' fees and expenses for *both* sides in the union conflict be paid by Local;[3] (5) Although payment of appellees' attorneys' fees and related expenses was duly approved by a constitutional vote of the membership of Local, appellants refused to pay these bills. On the contrary, appellants followed a course against the wishes of the majority vote by soliciting support for their refusal from International; (6) Despite efforts by appellees, pursuant to Title V—§ 501(b) of LMRDA, to have the union officers take remedial action, appellants still refused to pay the duly approved bills; (7) Appellees brought this action in the federal court below under Title V to force appellants to comply with the desires of the majority of Local—as expressed in their authorized vote—and pay appellees' attorneys' fees and related expenses; (8) One month after this litigation began, the General Executive Board of the International Union, on its own motion sent a directive to Local stating that the majority vote approval was null and void because it was "the subject of an unauthorized recommendation and because [it was] not properly voted upon." No union con-

**3.** On oral argument, counsel for appellees asserted that the attorneys' fees and expenses of *appellants* in the first federal action have been paid by Local. Counsel for appellants indicated that he wasn't aware that such bills had been paid, and that, in any event, they should not have been.

stitutional provision was cited in support of its conclusion or its further suggestion that a vote of the *entire* Local membership be taken.

Under these pertinent facts and stripped of the details discussed in the opinion below, we are of the view that appellants' refusal to pay appellees' attorneys' fees and related expenses as duly authorized by a majority vote of the local members constituted a violation of appellants' fiduciary responsibility within the meaning of Title V of the Landrum-Griffin Act—*independent of any action by the International Union.* According to Title V—§ 501(a), appellants "occupy positions of trust," yet they have breached that trust relationship, and contrary to the statutory provision, have failed "to refrain from dealing with such organization [Local] as an adverse party or in behalf of an adverse party in any matter connected with his [their] duties * * *." Appellants— opponents of appellees in previous proceedings—have allowed their personal feelings towards appellees to interfere with their duties as officers; have refused to pay the bills even though approved by the membership; have employed various tactics in an unsuccessful attempt to attain local approval for their conduct; have solicited support for their wrongful behavior from the International; and have thus assumed positions adverse to the interests of the local union as expressed in a majority vote, duly authorized by the union constitution. And contrary to appellants' assertion, the authorized payments do not constitute "donations," for the local union itself received substantial benefit from the first federal action brought by appellees. Fair and orderly procedures were restored to union trials; integrity was restored to the internal democratic processes of Local. Additionally, we agree with the trial court's conclusion that the eleventh-hour directive of International furnished no excuse for the action taken by appellants.

Implicit in our determinations is the recognition that, under the circumstances of this case, denial of relief to appellees under Title V would discourage resort to the courts by union members to establish their Title I rights. Likewise, to allow the directive of the International to stand as a defense to appellants' conduct would seriously undermine and frustrate appellees' rights under Title I. No *alleged* policy determination, no directive by any union official will be allowed to impair freedom of speech within the union. As stated by the court below, "it seems obvious * * that there is no point in these Petitioners [appellees] or any other union members going to their union meetings if they are going to be met with letters such as the one in this case sent by the GEB on November 15, 1961." 212 F. Supp. at 269. See and compare, Salzhandler v. Caputo, 2 Cir., 316 F.2d 445 (1963), cert. denied, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275; Young v. Hayes, D.D.C., 195 F.Supp. 911 (1961); Moschetta v. Cross, supra, 48 LRRM 2669; Gilbert v. Hoisting & Portable Engineers Local Union No. 701, Or., 384 P.2d 136 (1963); Madden v. Atkins, 4 N.Y.2d 283, 174 N.Y.S.2d 633, 151 N.E. 2d 73, 74 A.L.R.2d 772 (1958); Crossen v. Duffy, 90 Ohio App. 252, 103 N.E.2d 769 (1951). The directive from International—though seemingly a mere policy determination on its face—not only attempts to contramand the majority vote taken by Local and to deprive appellees of "reimbursement for their legal expenses for the first Federal trials; it suggested that if more kangaroo courts were forthcoming, there would be no help from GEB. This would in turn cause the Petitioners [appellees], men of modest means, to have to again seek the aid of the Federal courts. This is the way that freedom of speech in the union hall is snuffed out; this is the way that tyranny begins." 212 F.Supp. at 270.

Of course, it is of prime significance here that a duly authorized constitutional majority of Local's members voted to pay appellees' expenses; that these expenses were incurred pursuing rights which are of substantial benefit to Local as a whole;

## 654

that a personal animosity toward appellees motivated appellants' refusal to pay the expenses; and that International's eleventh-hour "policy" directive was not based upon union constitutional authority, and was not, in fact, the real cause for appellants' conduct. We are by no means announcing a rule requiring payment of attorneys' fees to successful union member litigants in every Title I court proceeding—regardless of the circumstances. Vars v. International Brotherhood of Boilermakers, Etc., D. Conn., 215 F.Supp. 943, 952 (1963)—cited by appellants in oral argument—is not contrary to our decision here. In Vars, the union member asserting violation of rights under Title I attempted to recover his attorneys' fees in that very Title I action, and—among other factual differences—there had been no union vote approving such expenses to be paid by the local.

Appellants additionally assert that Parks v. International Brotherhood of Electrical Workers, D.Md., 203 F.Supp. 288 (1962), was very strongly relied upon by the court below, that the Parks case has since been reversed, supra, 314 F.2d 886, and that the principles laid down by the Fourth Circuit in its opinion reversing the district court are decisive of the issues in this case and require a reversal of the holding below. To be sure, the court below agreed with many of the pronouncements of the district court in Parks, but the ultimate decision below was not based upon the rationale of Parks. More importantly, the factual circumstances of the two cases are clearly distinguishable. The Fourth Circuit itself stated:

> "This court recognizes that should it be demonstrated in an appropriate case that the *basic* reason for union discipline was that the plaintiff had resorted to a court of law to secure his rights and that other reasons were mere shams, such discipline would most likely be invalid both as a breach of fiduciary obligation and because it is prohibited under §§ 609 and 101(a) (4) of the

LMRDA, 29 U.S.C.A. §§ 529 and 411(a) (4). But such a case would be different from the present one. * * *" 314 F.2d at 911.

Parks is not decisive of the issues here involved.

Accordingly, we affirm.