20428. INTERNATIONAL ASSOCIATION OF MACHINISTS *et al. v.* STREET *et al.*

ARGUED APRIL 14, 1959—DECIDED MAY 8, 1959.

*Milton Kramer, Schoene & Kramer, David L. Mincey, C. E. Gregory, Jr., Arnall, Golden & Gregory,* for plaintiffs in error.

*Gambrell, Harlan, Russell, Moye & Richardson, Terry P. McKenna, Bloch, Hall, Groover & Hawkins, Charles J. Bloch, Harris, Russell, Weaver & Watkins,* contra.

ALMAND, Justice. When this case was before this court on a bill of exceptions assigning error on the dismissal of the plaintiffs' petition, we reversed the order of dismissal because, by reason of the allegations of paragraph 59(b) of the amended petition, that "The initiation fees, periodic dues and assessments which plaintiffs would be required to pay under the terms of the union shop agreement heretofore referred to will be used in substantial part for purposes not germane to collective bargaining but to support ideological and political doctrines and candidates which plaintiffs are not willing to support and cannot lawfully be forced to support, thus violating plaintiffs' constitutionally guaranteed rights of freedom of association, thought, liberty and property," and of paragraph 51 of the amended petition, that "Petitioners allege that sec. 2 Eleventh of the Railway Labor

Act (45 U.S.C.A. sec. 152 Eleventh), to the extent that it authorizes the union shop agreement heretofore referred to, and said agreement, are violative of the First, Fifth, and Ninth Amendments to the Constitution of the United States of America, and are therefore invalid," the petition as against a general demurrer was sufficient to state a cause of action for equitable relief. *Looper* v. *Georgia So. & Fla. Ry. Co.*, 213 *Ga.* 279 (99 S. E. 2d 101). We there said that, though the ruling of the Supreme Court of the United States (Railway Emp. Dept. *v.* Hanson, 351 U.S. 225 (3c), 76 S. Ct. 714, 100 L. Ed. 1112) upheld the validity of a union shop agreement executed under sec. 2, Eleventh, of the Railway Labor Act (45 U.S.C.A. § 152), in view of the statement made in the opinion that "Judgment is reserved as to the validity or enforceability of a union or closed shop agreement if other conditions of union membership are imposed or if the exaction of dues, initiation fees or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First or the Fifth Amendment," the question of whether the union shop agreement violated the plaintiffs' rights under the First and Fifth Amendments to the Federal Constitution, under the alleged facts in this case, was left open for future determination.

When the case was returned to the trial court the defendant unions filed their answer. At a pre-trial hearing, the trial judge entered an order requiring the union defendants to produce certain books, documents, and records and the appearance of officers and agents to testify with respect to them. The motion of the union defendants to suspend this order until their plea of res adjudicata could be inquired into was denied. On September 23, 1958, the plaintiffs filed an amendment to their petition. The objections of the union defendants to this amendment were overruled. At a later pre-trial hearing the plea of res adjudicata was withdrawn. A stipulation of facts, executed by all the parties on August 14, 1958, was approved by the court and filed. This stipulation consists of 85 stipulations covering 45 pages. We set out here only those stipulations that we deem most pertinent to the issues.

"2. Each of the plaintiffs and each of the intervening plain-

tiffs was an employee of one of the railroad defendants herein (collectively constituting the Southern Railway System) in a craft or trade covered by the union shop agreement at the commencement of this litigation.

"3. Some of the plaintiffs and intervening plaintiffs are not now, and never have been, members of any of the defendant labor union organizations (their status being protected by supersedeas bond).

"8. Each of the plaintiffs, and intervening plaintiffs, and the class they represent received notice, both from the railroad defendant employer and the labor union defendant applicable to his or her craft or trade, that unless he or she became a member of the appropriate labor union defendant within 60 days of the date he or she first performed compensated service for the railroad defendant, or within 60 days of the effective date of the union shop agreement, whichever is the later, such employment would be terminated and such employee dismissed pursuant to the union shop agreement.

. "12. The *union shop agreement* referred to in paragraph 1 above *was negotiated by the labor union defendants with the railroad defendants without any authorization from the employees of such railroad defendants embraced within the craft or trade applicable to each labor union defendant* [ital. ours], other than such authority as might be implied from each labor union defendant's being the collective bargaining representative of employees of such railroad within such craft or trade for the purposes of the Railway Labor Act from the dates and as set forth in paragraph 13. The usual processes of the defendant unions in determining collective bargaining policy were followed. Such processes do not, and in the instance of the negotiation and execution of the union shop agreement did not, involve any notice to the employees of the railroad defendants that the negotiation and execution of such an agreement was contemplated, or any opportunity to express their wishes pro or con with respect to such negotiation and execution of the union shop agreement, or any opportunity to ratify or reject such action.

"14. Each of the plaintiffs and intervening plaintiffs was employed for many years by one of the railroad defendants prior

to the execution of the union shop agreement hereinabove referred to, and that also is true of many others of the class represented by the plaintiffs and intervening plaintiffs, *and none of such persons had notice prior to entering into an employment relationship with such railroad defendant that union membership would at any time be required as a condition of employment or continued employment* [ital. ours].

"19. The periodic dues, fees and assessments which plaintiffs, intervening plaintiffs and the class they represent, have been, are and will be required to pay under the terms of the union shop agreement hereinabove referred to, have been, are being, and *will be used in substantial part for purposes other than the negotiation, maintenance, and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms and other conditions of employment, or the handling of disputes relating to the above, but to support ideological and political doctrines and candidates which plaintiffs, intervening plaintiffs, and the class represented by them, were, are, and will be opposed to and not willing to support voluntarily* [ital. ours].

"20. The mechanism by which the periodic dues, fees and assessments required to be paid under the terms of the union shop agreement were, are and will be used in substantial part to support ideological and political doctrines and candidates for public office which plaintiffs, intervening plaintiffs, and the class represented by them, are not willing to support, is as set forth in this Stipulation.

"A substantial portion of the periodic dues, fees and assessments required of plaintiffs, intervening plaintiffs, and the class they represent, or which will be so required, has been, is being and will be retained by, or remitted to, the individual local lodge of the labor union defendant to which each such person paid and will be required to pay his dues, and has been, is being, and will be, used to support legislative activity in the legislatures of the State or States covered by the membership of such local lodge, including miscellaneous general legislation not confined to legislation involving the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms and other conditions of employment,

or the handling of disputes relating to the above and, except in Wisconsin, New Hampshire, Pennsylvania, Indiana, Texas and Iowa, *to extend substantial financial support to candidates for public office in the executive, legislative and judicial branches of the state and local governments in the locality of the local union* [ital. ours].

"21.   Some of the legislative and political activities referred to in the preceding paragraph are carried out by some of the individual local lodges of the labor union defendants, and in some situations, such activities were, are, and will be carried out on a cooperative basis, the local lodges of several of the defendant unions cooperating (not only between themselves, but also with local lodges of labor unions not defendants in this litigation, through State, district and local AFL-CIO central bodies and their Committees on Political Education as well as ad hoc committees), and in some instances the financial support for such local legislative and political activities is derived not only from the local lodge organizations but also from direct grants from the general dues funds of the national or grand lodge organization of a particular labor union defendant.

"In each instance where 'general fund' or 'general dues fund' or like phrase is employed in this Stipulation of Facts (except where used in reference to the Machinists Non-Partisan Political League, where the phrase is used to denote the 'political' fund which is derived from individual contributions), it refers to the fund or account, or that part thereof, derived and maintained from periodic dues, fees and assessments of the members of such organization.

"22.   A substantial proportion of the periodic dues, fees and assessments collected by the labor union defendants from their members was, is, and will be transmitted to, or retained by, their respective national or grand lodge organizations.

"29.   Railway Labor's Political League was formed for the specific purpose of engaging in political activities dealing with the election of candidates to public office.   The organization maintains two funds—one the so-called 'educational' fund and the other the so-called 'free' fund.   Railway Labor's Political League received, receives, and will receive direct grants into its

'educational' fund from the general funds of the union defendants and from the Railway Labor Executives Association. The monies in the 'educational' fund are used, except in Wisconsin, New Hampshire, Pennsylvania, Indiana, Texas, and Iowa, to support candidates for public office at the State and local level; for publicity to support candidates on the national as well as the State and local level; for administrative expenses to operate Railway Labor's Political League generally (including the salaries of the paid employees of that organization, office expense, supplies, etc.); and for miscellaneous activities in supporting candidates (whom plaintiffs, intervening plaintiffs, and the class they represent oppose) at the national, State or local level, such as transportation of voters to and from the polls, preparation and distribution of voting records, preparation and distribution of sample ballots, and the preparation and distribution of various types of political literature soliciting or influencing support for candidates for public office on the national, State and local levels.

"The administration, operation and maintenance of the 'free' fund activities of Railway Labor's Political League has been, is and will be financed and supported by direct expenditures from the 'educational' fund of Railway Labor's Political League derived from the general dues funds of the labor union defendants.

"43. The funds expended by the labor union defendants for political activities as set forth in this Stipulation of Facts are substantial, and the proportionate amounts of the periodic dues, fees and assessments which are being paid, or which will be required to be paid, by the plaintiffs and intervening plaintiffs and the class they represent are also substantial, and the amounts of such dues which are and will be used ultimately for political purposes are also substantial.

"44. The plaintiffs, intervening plaintiffs, and the class they represent have been and are opposed to the use of their money by the labor union defendants, Railway Labor Executives Association, Railway Labor's Political League, Machinists Non-Partisan Political League, the American Federation of Labor and Congress of Industrial Organizations, and the Committee on Political Education of the AFL-CIO which they have been, are and will be required to pay in dues, fees and assessments for the

endorsement and support of the legislation, ideologies and political doctrines and candidates for public office which have been, are and will be supported and endorsed by the labor union defendants, Railway Labor Executives Association, Railway Labor's Political League, Machinists Non-Partisan Political League, the American Federation of Labor and Congress of Industrial Organizations, or the Committee on Political Education of the AFL-CIO as set out in this Stipulation of Facts, or for other purposes other than the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms and other conditions of employment, or the handling of disputes relating to the above.

"53. The political activities mentioned in this Stipulation of Facts do not involve and are unnecessary to the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms and other conditions of employment, or the handling of disputes relating to the above.

"56. The labor union defendants and, in many instances, subsidiary lodges and organizations subject to the provisions of their governing constitutions and by-laws, have power to make assessments and to increase the amount and level of the dues and fees required for membership in said organizations, and plaintiffs and intervening plaintiffs and the class they represent are and will be required to pay any such increased amounts in order to retain their employment under the terms of the union shop agreement.

"75. In each instance where support of candidates, ideologies, or legislation is referred to in this Stipulation of Facts, such reference is intended to cover not only the affirmative support of particular candidates, ideologies or legislative issues, but also opposition to other candidates, ideologies or legislative issues.

"76. The determination of the legislative, political, and ideological programs and activities of the labor union defendants, Railway Labor Executives Association, Railway Labor's Political League, the Machinists Non-Partisan Political League, the AFL-CIO or the latter's Committee on Political Education, as set out in this Stipulation of Facts and the depositions referred

to in the Stipulation attached hereto, does not involve participation by the plaintiffs, intervening plaintiffs and the class they represent; the views of plaintiffs, intervening plaintiffs and the class they represent have not been sought; and they have not ratified such activities or programs, nor have they acquiesced therein."

The stipulation also details the amounts of dues or fees paid by named plaintiffs to specific defendant unions under the terms of the bargaining agreement.

The cause, by agreement of the parties, was heard by the court without the intervention of a jury on plaintiffs' prayers for a permanent injunction. After a hearing and argument of counsel, the court entered an order, consisting of findings of fact, conclusions of law, and a final decree granting the relief sought by the plaintiffs. The court found and decreed that: "(1) The court has jurisdiction of all parties and of the causes of action asserted by the plaintiffs. This is a class action in which the plaintiffs represent herein all non-operating employees of the railroad defendants affected by, and opposed to, the hereinafter referred to union shop agreements, who also are opposed to the collection and use of periodic dues, fees and assessments for support of ideological and political doctrines and candidates and legislative programs or for other purposes other than the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms or other conditions of employment or the handling of disputes relating to the above. The individual defendants and labor organization defendants represent all the members of said labor organization defendants; (2) Effective April 15, 1953, the labor organization defendants, without authority from the employees represented by them but relying upon such authority as might be implied from the Railway Labor Act, and without affording said employees any opportunity to express themselves with respect thereto, entered into union shop agreements with the railroad defendants. The union shop agreements provide, in part, that all non-operating employees of the railroad defendants, including plaintiffs and those represented by plaintiffs, must 'as a condition of their continued employment subject to such agree-

ments, become members of the organization party to this agreement representing their craft or class (the labor organization defendants herein) within sixty (60) calendar days of the date they first perform compensated service as such employees after the effective date of this agreement, and thereafter shall maintain membership in such organizations' and that 'Nothing in this agreement shall require an employee to become or to remain a member of the organization if such membership is not available to such employee upon the same terms and conditions as are generally applicable to any other member, or if the membership of such employee is denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership; . . . (4) Pursuant to the said union shop agreements, and, except as indicated in paragraph (3) above, each of the plaintiffs and each member of the class they represent has been, is being, and, unless the injunction requested by them is granted, will be compelled to pay initiation fees, reinstatement fees and periodic dues in substantial amounts to the labor organization defendant representing his or her craft or trade as a condition of employment or continued employment, and to become or remain a member of said labor organization defendant; (5) The funds so exacted from plaintiffs and the class they represent by the labor union defendants have been, and are being, used in substantial amounts by the latter to support the political campaigns of candidates for the offices of President and Vice President of the United States, and for the Senate and House of Representatives of the United States, opposed by plaintiffs and the class they represent, and also to support by direct and indirect financial contributions and expenditures the political campaigns of candidates for State and local public offices, opposed by plaintiffs and the class they represent. The said funds are so used both by each of the labor union defendants separately and by all of the labor union defendants collectively and in concert among themselves and with other organizations not parties to this action through associations, leagues, or committees formed for that purpose; (6)

Those funds have been and are being used in substantial amounts to propagate political and economic doctrines, concepts and ideologies and to promote legislative programs opposed by plaintiffs and the class they represent. Those funds have also been and are being used in substantial amounts to impose upon plaintiffs and the class they represent, as well as upon the general public, conformity to those doctrines, concepts, ideologies and programs; (7) The exaction of monies from plaintiffs and the class they represent for the purposes and activities described above is not reasonably necessary to collective bargaining or to maintaining the existence and position of said union defendants as effective bargaining agents or to inform the employees whom said defendants represent of developments of mutual interest; (8) The exaction of said money from plaintiffs and the class they represent, in the fashion set forth above by the labor union defendants, is pursuant to the union shop agreements and in accordance with the terms and conditions of those agreements. Said union shop agreements were negotiated and entered into and are maintained, administered and enforced by the labor union defendants pursuant to the provisions of the Railway Labor Act (45 U.S.C. Sect. 151 et seq.) and particularly Section 2 (First), (Second), (Third), (Fourth), (Seventh), and (Eleventh), 5, 6 and 10 thereof. Said union shop agreements are permitted by Section 2 (eleventh) of the Railway Labor Act (45 USC 152) 'notwithstanding any other provision of this Act, or of any other statute or law of the United States, or territory thereof, or of any State.' Said exaction and use of money and said union shop agreements and their enforcement are contrary to the Constitution, the law and public policy of this State, and are contrary to the statutes or laws of other states in which the defendant railroads operate. Said exaction and use of money, said union shop agreements and Section 2 (eleventh) of the Railway Labor Act and their enforcement violate the United States Constitution which in the First, Fifth, Ninth and Tenth Amendments thereto guarantees to individuals protection from such unwarranted invasion of their personal and property rights, (including freedom of association, freedom of thought, freedom of speech, freedom of press, freedom to work and their political

freedom and rights) under the cloak of federal authority." On the basis of these findings the trial court perpetually enjoined the defendants "from enforcing the said union shop agreements (copies of which are attached as exhibits to the petition herein) and from discharging petitioners, or any member of the class they represent, for refusing to become or remain members of, or pay periodic dues, fees, or assessments to, any of the labor union defendants, provided, however, that said defendants may at any time petition the court to dissolve said injunction upon a showing that they no longer are engaging in the improper and unlawful activities described above." And the court granted money judgments in favor of three plaintiffs.

The union defendants filed their bill of exceptions, in which they assigned error on interlocutory rulings and on the final decree, generally and specially.

■ Error is assigned on the order allowing the amendment of January 29, 1957, over the objection that it was too late to change the cause of action (that the closed or union shop agreement violated the First, Fifth, Ninth, and Tenth Amendments to the Federal Constitution). This exception cannot be entertained because the order excepted to was entered prior to the order dismissing the petition, which order was reviewed and reversed by this court in *Looper* v. *Georgia So. & Fla. Ry. Co.*, 213 *Ga.* 279, supra; and the union defendants not having sought a review of the order of January 29, 1957, by cross-bill of exceptions, it is too late now to except. *Gaulding* v. *Gaulding*, 210 *Ga.* 638 (81 S. E. 2d 830); *Carmichael Tile Co.* v. *McClelland*, 213 *Ga.* 656 (100 S. E. 2d 902).

■ Error is assigned on the order allowing the amendment to plaintiffs' petition of September 23, 1958. In this amendment certain paragraphs of the petition were deleted and new paragraphs inserted. This amendment set out specific facts as to the employment of the several plaintiffs with the railroad defendants, and alleged that the dues, fees, and assessments required by the union defendants are being and will be used to espouse and support political and economic ideologies repugnant to the plaintiffs and the class they represent. It further alleged that the sole authority under which the union defendants pur-

ported and purport to bargain and contract with the railroad defendants is by virtue of the Railway Labor Act (45 U.S.C.A. §§ 152, 156); and that the union shop contract executed by the defendants is contrary to the laws and public policy of the State of Georgia; and, in so far as the Railway Labor Act permits or authorizes the union defendants to use the dues, fees, and assessments paid by union members for ideological and economic doctrines and to support political candidates, which and whom the plaintiffs oppose, the same violates the provisions of the First, Fifth, Ninth, and Tenth Amendments to the Federal Constitution. The objections to this amendment were on the grounds: that (a) it changed the cause of action, (b) sought to change the theory of the case, (c) sought further relief not theretofore sought, and (d) the assertion of Federal rights was precluded because of the plaintiffs' motion to remand the case from the Federal District Court.

There is no merit in any of these objections. When the case was reviewed by this court (*Looper* v. *Georgia So. & Fla. Ry. Co.*, 213 *Ga.* 279, supra), the plaintiffs' right to proceed was sustained by reason of the allegations that the agreement violated Federal rights. The amendment merely elaborated the allegations originally asserted.

■ On May 8, 1958, at a pre-trial hearing, the court granted the plaintiffs' oral motion requiring the defendant unions to produce books, records, and documents, over the objection that the defendant unions had no notice that such a motion would be presented. Subsequently, the union defendants filed a motion, which was denied, to suspend this order until their plea of res adjudicata was passed upon. (The record discloses that this plea was subsequently withdrawn.) It is asserted that these orders deprived the defendant unions of due process of law, and equal protection of the law as guaranteed by the Fourteenth Amendment, in that these rulings deprived them of an adequate opportunity to defend the case. (The bill of exceptions recites that no constitutional questions were made or argued to the court, and no objection was made to the introduction of the stipulation of facts.) It is further asserted that after all the evidence had been introduced, the court denied the oral request

of counsel for the defendant unions to postpone oral argument until a transcript of the proceedings had been completed and briefs prepared; and that after the court had orally announced its conclusions, and counsel had presented to the court a suggested order, the court allowed counsel for the defendant unions insufficient time, before signing the same, to consider and offer objections as to the terms of the order. They contend that this hasty procedure deprived them of their right to make a proper and adequate defense.

If the legal rights of the parties are not prejudiced or denied, this court will not interfere with the discretion of the trial court in matters of practice in the hearing and disposition of causes before it unless this discretionary power has been exercised in an illegal, unjust, or arbitrary manner. *Johnson* v. *Holt*, 3 *Ga.* 117(1); *Cooper* v. *Jones*, 24 *Ga.* 473(3); *Mayor &c. of Cuthbert* v. *Brooks*, 49 *Ga.* 179(2); *Branch* v. *Planters' Loan &c. Bank*, 75 *Ga.* 342(1). We have carefully considered the error assigned on the manner in which the trial judge heard and disposed of the motions and requests in the trial of this case, and cannot say that his disposition of them was illegal, arbitrary, or an abuse of his discretion.

■ We next consider the assignments of error on the specific findings of fact and conclusions of law contained in the final decree. These objections are set out in divisions 5-11 incl., 13-18 incl., and 22 of the bill of exceptions. It would serve no useful purpose to enumerate the several objections here. The findings and conclusions of the court are fully supported by the pleadings and the evidence, and we find no merit in these assignments of error.

■ As to the provision of the final decree, that it operated "as an adjudication of the basic common rights asserted by the plaintiffs in their own behalf and in behalf of other employees of the defendant railroads similarly situated," the union defendants assign error on the ground "that the case cannot properly or lawfully adjudicate rights of persons other than the named plaintiffs and intervening plaintiffs, because the persons described as constituting the class cannot properly constitute a class for the purpose of a class action," and "that a class action

cannot be brought or maintained on behalf of a group, the components of which are determined by ascertaining the mental attitude of persons concerning certain matters." The case as finally amended was on behalf of plaintiffs and all others similarly situated, who had a common interest in the relief sought. No demurrers were interposed that the complaint was not a proper class action as permitted under Code § 37-1002. The stipulation of facts contains the following:

"5. There are a substantial number of other employees of the railroad defendants who similarly have been compelled by the union shop agreement, against their wishes, to become members of the defendant labor union organizations in order to maintain their employment.

"6. There were a substantial number of employees of the railroad defendants whose employment was terminated against their wishes, although their services were satisfactory, by reason of the enforcement of the union shop agreement and the refusal of such persons to become members of the labor union defendants.

"7. The plaintiffs and intervening plaintiffs fairly and adequately represent for the purposes of this litigation the interests of the employees and former employees of the railroad defendants specified in the two preceding paragraphs, as well as those whose status as members of one of those two groups has not as yet been finally determined, these being all those employees or former employees of the railroad defendants affected by and opposed to the union shop agreement who also are opposed to the use of the periodic dues, fees and assessments which they have been, are and will be required to pay to support ideological and political doctrines and candidates and legislative programs set forth in this Stipulation of Facts and the depositions referred to in the Stipulation attached hereto, or for other purposes other than the negotiation, maintenance and administration of agreements concerning rates of pay, rules and working conditions, or wages, hours, terms or other conditions of employment or the handling of disputes relating to the above."

The plaintiffs and the class they represent have a common interest in the subject matter of the suit and the ultimate issues decided. The objection interposed to this phase of the decree

is without merit. See *O'Jay Spread Co.* v. *Hicks,* 185 *Ga.* 507 (195 S. E. 564); *Evans* v. *Louisville & Nashville R. Co.,* 191 *Ga.* 395 (12 S. E. 2d 611); *Liner* v. *City of Rossville,* 212 *Ga.* 664 (94 S. E. 2d 862).

■ The court found as a matter of fact: "(6) Those funds have been and are being used in substantial amounts to propagate political and economic doctrines, concepts and ideologies and to promote legislative programs opposed by plaintiffs and the class they represent. Those funds have also been and are being used in substantial amounts to impose upon plaintiffs and the class they represent, as well as upon the general public, conformity to those doctrines, concepts, ideologies and programs; (7) The exaction of monies from plaintiffs and the class they represent for the purposes and activities described above is not reasonably necessary in collective bargaining or to maintaining the existence and position of said union defendants as effective bargaining agents or to inform the employees whom said defendants represent of developments of mutual interest."

Under our previous ruling (*Looper* v. *Georgia So. & Fla. Ry. Co.,* 213 *Ga.* 279, supra), that the allegations of the petition were sufficient to state a cause of action for equitable relief, which ruling became the law of the case, the evidence before the trial court not only authorized, but demanded, a finding that the plaintiffs had proven the case as laid in the amended petition. In the statement of the case we have set out the pertinent portions of the stipulation of facts. The record in this case contains 1,075 pages, which in the main consist of documentary exhibits. To brief the evidence or to state a capsule summary of the same would serve no useful purpose. We have reviewed this evidence. It fully supports the conclusions of the trial court.

■ The court found as a matter of law:

"(8) The exaction of said money from plaintiffs and the class they represent, in the fashion set forth above by the labor union defendants, is pursuant to the union shop agreements and in accordance with the terms and conditions of those agreements.

"Said union shop agreements were negotiated and entered into and are maintained, administered and enforced by the labor

union defendants and the railroad defendants pursuant to the provisions of the Railway Labor Act (45 U.S.C. sec. 151 et seq.) and particularly section 2 (First), (Second), (Third), (Fourth), (Seventh) and (Eleventh), 5, 6 and 10 thereof.

"Said union shop agreements are permitted by Section 2 (eleventh) of the Railway Labor Act (45 U.S.C. 152) 'notwithstanding any other provision of this Act, or of any other statute or law of the United States, or territory thereof, or of any State.'

"Said exaction and use of money and said union shop agreements and their enforcement are contrary to the Constitution, the law and public policy of this State, and are contrary to the statutes or laws of other states in which the defendant railroads operate. Said exaction and use of money, said union shop agreements and Section 2 (eleventh) of the Railway Labor Act and their enforcement violate the United States Constitution which in the First, Fifth, Ninth and Tenth Amendments thereto guarantees to individuals protection from such unwarranted invasion of their personal and property rights, (including freedom of association, freedom of thought, freedom of speech, freedom of press, freedom to work and their political freedom and rights) under the cloak of federal authority." Division 11 of the bill of exceptions assigns error on this conclusion.

In our opinion it cannot be disputed that the union shop agreement between the railroad and union defendants was executed only by virtue of section 2 (Eleventh) of the Railway Labor Act (45 U.S.C.A. § 152). If that section of the Federal act permits or allows the defendants to make contracts in violation of the constitutional rights of the plaintiffs, they have the right to challenge the validity of the contract in so far as it may infringe their rights under the Federal Constitution. Railway Emp. Dept. v. Hanson, 351 U.S. 225 (76 S. Ct. 714, 100 L. Ed. 1112); American Communications Association v. Douds, 339 U.S. 382 (70 S. Ct. 674, 94 L. Ed. 925); Steele v. L. & N. Ry. Co., 323 U.S. 192 (65 S. Ct. 226, 89 L. Ed. 173).

The fundamental constitutional question is: Does the contract between the employers of the plaintiffs and the union defendants, which compels these plaintiffs, if they continue to work for the employers, to join the unions of their respective crafts, and pay

dues, fees, and assessments to the unions, where a part of the same will be used to support political and economic programs and candidates for public office, which the plaintiffs not only do not approve but oppose, violate their rights of freedom of speech and deprive them of their property without due process of law under the First and Fifth Amendments to the Federal Constitution?

The Bill of Rights does not confer rights. They are the "shall nots" of what the government, its agents, or those acting under the aegis of its authority, cannot do respecting the enumerated rights of the individual. The Declaration of Independance contained 27 specifications of the wrongs that the English King and Parliament had inflicted upon individuals living in the American Colonies. Magna Carta was a declaration of protest against trespass by government on the rights of individuals, and an affirmation of the natural rights of man so forthrightly set forth more than five hundred years later in the Bill of Rights. Chapter 39 of Magna Carta declared: "No freeman shall be taken or imprisoned or disseized of his freehold or liberties or free customs or outlawed or exiled or in any way destroyed; nor shall one go upon him, nor send upon him but by the lawful judgment of his peers or by law of the land."

During Georgia's colonial period, its citizens were taxed to pay for the support of one religious denomination to the exclusion of others. To guarantee the people of the State that no one should ever be compelled to attend or support any church, contrary to his own faith and judgment, and to restrain the arm of government from ever attempting, directly or indirectly, to mould the religious beliefs of the people, the Constitution of Georgia of 1798 contained this provision: "No person within this State shall, upon any pretence, be deprived of the inestimable privilege of worshipping God in a manner agreeable to his own conscience, nor be compelled to attend any place of worship contrary to his own faith and judgment; nor shall he ever be obliged to pay tithes, taxes, or any other rate, for the building or repairing any place of worship, or for the maintenance of any minister or ministry, contrary to what he believes to be right, or hath voluntarily engaged to do. No one religious society

shall ever be established in this State, in preference to another; nor shall any person be denied the enjoyment of any civil right merely on account of his religious principles." Art. 4, sec. 10.

The Bill of Rights preserves the untouchable rights of the individual where in their exercise, no harm or injury results to others or to the public. Coercion or compulsion is the antithesis of freedom or liberty. In the area of choice, support or association of or with the political or economic views of others, the individual has the natural right not only to disagree but to rebel against either regimentation or restraint in the exercise of his own judgment. Mr. Justice Douglas in his dissenting opinion in Public Utilities Commission of the District of Columbia v. Pollak, 343 U.S. 451 (72 S. Ct. 813, 96 L. Ed. 1068), in discussing the meaning of liberty as used in the Fifth Amendment, said: "The right to be let alone is indeed the beginning of all freedom. . . Compulsion which comes from circumstances can be as real as compulsion which comes from a command."

Certain observations of the late Mr. Justice Jackson, in writing the majority opinion for the court in West Virginia Board of Education v. Barnette, 319 U.S. 624 (63 S. Ct. 1178, 87 L. Ed. 1628), a case involving the constitutionality of rules adopted by a local board of education under authority of a state statute, requiring students in public schools to salute the flag and pledge allegiance to the United States, upon penalty of expulsion for refusal to comply, are worthy of repetition here. In holding that such compulsory action violated the First and Fourteenth Amendments, Mr. Justice Jackson said: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections [at page 638]. . . Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard [at page 641]. . . We set up government by con-

sent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent [at page 641]. . . . If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us [at page 642]."

One who is compelled to contribute the fruits of his labor to support or promote political or economic programs or support candidates for public office is just as much deprived of his freedom of speech as if he were compelled to give his vocal support to doctrines he opposes. Abraham Lincoln asserted a similar view when he said: "I believe each individual is naturally entitled to the fruits of his labor, so far as it in no wise interferes with any other man's right." There is a common saying, that "Money talks—sometimes louder than the spoken word." In the case at bar, the personal convictions of the plaintiffs on political and economic issues are being combatted by the use of their financial contributions to foster programs and ideologies which they oppose.

This is not a case where the plaintiffs are seeking employment with the railroads which have union shop agreements providing that, to be employed, they would be required to join a union, but one where they were in the employ of the railroads at the time the union shop agreements were entered into between the defendants. They are now confronted with the choice of either joining the union or surrendering their jobs and benefits that come from tenure of service, and seeking work elsewhere. If the requirement by the employer of his employe, as a condition of his employment, that he agree not to join a union, subjecting himself to be discharged if he did (now forbidden by the Railway Labor Act, 45 U.S.C.A. § 152, and the National Labor Relations Act, 29 U.S.C.A. § 157), is obnoxious to the employee's economic freedom to contract, then the requirement by the employer, based upon an act of the Federal Congress, that one in his employ as a condition of continued employment, would be compelled to join a union and pay dues, fees, and assessments which will be

used in part for the support of ideologies he opposes, is likewise violative of his freedom to contract under the Fifth Amendment.

While these observations on the Bill of Rights may appear as being old-fashioned and representative of the views of statesmen and judges long since dead, and not in harmony with some schools of thought that maintain that the Constitution must be construed or applied to meet new conditions in the light of present-day thought, and that the Constitution must be expanded or contracted—as if it were an elastic girdle—to accommodate the public diet, we will continue to adhere to the view that the Constitution can be changed only by the method provided therein.

In the light of our prior decision in this case and what has been said above, and the evidence in this case, the final decree was not erroneous for any reason assigned.

*Judgment affirmed. All the Justices concur.*