HIGHWAY TRUCK DRIVERS AND HELPERS LOCAL 107, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, an unincorporated association, by Thomas Graham, Carmen Grasso, Anthony Hnizdo, Jr., Karl M. Jensen, John C. Jones, Edward P. McCormick, John Regan, William D. Stasen and Robert D. Thomas, Trustees ad litem

v.

Raymond COHEN, Joseph E. Grace, Edward Battisfore, Edward Walker and Benjamin Lapensohn.

Civ. A. No. 27053.

United States District Court
E. D. Pennsylvania.

March 24, 1960.

**610**

Edward B. Bergman, Philadelphia, Pa., for plaintiffs.

Samuel Dash, Philadelphia, Pa., for defendants, Raymond Cohen, Joseph E. Grace, Edward Battisfore and Edward Walker.

Morton Witkin, Philadelphia, Pa., for defendant, Benjamin Lapensohn.

Richard H. Markowitz, Philadelphia, Pa., for Union.

CLARY, District Judge.

This is a private suit brought under the recently enacted Labor Management Reporting and Disclosure Act of 1959, Public Law 86–257 (hereinafter referred to as the "Act"), 29 U.S.C.A. § 401 et seq. That Act establishes a fiduciary responsibility on the part of officers of a labor organization [§ 501(a)], and further provided for a suit in a Federal district court to enforce these responsibilities [§ 501(b)]. The present suit has been brought under § 501(b) to enforce certain of these duties.

The moving parties are nine rank-and-file members of Highway Truck Drivers and Helpers, Local 107, of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter referred to as "Local 107"), who were given leave by this Court on November 12, 1959 to file a complaint against the defendants, the governing officers of Local 107.[1] The complaint charged the defendants with a continuing mass conspiracy to cheat and defraud the union of large sums of money— the conspiracy alleged to have begun in 1954 and continued to the present time.

The defendants have yet to answer these very serious charges. Having been unsuccessful in first opposing the plaintiffs' petition for leave of this Court to sue,[2] defendants now move to have the complaint dismissed. They are supported in this motion by counsel for Local 107, which has been allowed to intervene as a party defendant. This motion to dismiss is presently before the Court along with the plaintiffs' prayer for a preliminary injunction to prohibit the defendants from using union funds to defray the legal costs and other expenses being incurred by the defendants (and several other members of Local 107) in the defense of civil and criminal actions brought against them in the Courts of Pennsylvania and also the present suit in our own Court. The charges in these cases, in essence, grow out of the alleged activities of the defendants complained of here. The question of the preliminary injunction will be taken up after we resolve the motion to dismiss the complaint.

### Motion To Dismiss

Section 501(a) of the new Act establishes a federal duty on the part of labor union officials to abide by the ordinary rules of fiduciary responsibility. Section 501(a) states:

"The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the bene-

---

1. Benjamin Lapensohn, a named defendant, is not an officer of Local 107 and for reasons hereinafter stated the action will be dismissed as to him.

2. § 501(b) specifically provides that "No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown * * *".

fit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy."

Its complement, § 501(b) authorizes suit in a federal court to enforce the duties imposed by subsection (a). Section 501(b) states:

"When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. The trial judge may allot a reasonable part of the recovery in any action under this subsection to pay the fees of counsel prosecuting the suit at the instance of the member of the labor organization and to compensate such member for any expenses necessarily paid or incurred by him in connection with the litigation."

On September 30, 1959 the plaintiffs filed an application for leave to sue under § 501(b) and annexed the complaint which has since been filed by Order of this Court. Aside from the alleged continued expenditure of union funds to defend the criminal and civil suits brought against the defendants and others mentioned above, the only *specific* acts of misconduct alleged in this complaint relate to events occurring between June 1, 1954 (the date the defendants took office) and September 1957. The remainder of the complaint contains several *general* claims of fraud and breach of duty and alleges that such acts are continuing to the present time, and that these can only be discovered by an accounting. In light of this fact, the defendants vigorously assert that we must dismiss the complaint, since § 501(a) and (b) apply prospectively only and can not be applied to acts occurring prior to September 14, 1959, the effective date of § 501.

The defendants' contention that those alleged wrongs which occurred *prior* to the enactment of § 501 can not alone constitute a basis for recovery under that section, must be accepted. Aside from the fact that the plaintiffs have not attempted to meet this contention, the principle that a statute which creates a new substantive right or duty will not, in the absence of clear legislative intent to the contrary, be construed to apply retrospectively, is too well established to admit of argument. Brewster v. Gage, 1930, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457; Miller v. United States, 1935, 294 U.S. 435, 55 S.Ct. 440,

79 L.Ed. 977; Home Indemnity Co. v. State of Missouri, 8 Cir., 1935, 78 F.2d 391; Peony Park, Inc. v. O'Malley, 8 Cir., 1955, 223 F.2d 668.

Moreover the question of retrospective application of the Act has only recently been passed on by Judge Mathes in the Southern District of California, Flaherty v. McDonald, 1960, 183 F.Supp. 300. Although that case dealt with Title III of the Act, rather than Title V, we believe that that court's reasoning is applicable here. Like the trusteeship provisions of Title III, Title V creates new substantive rights and duties not formerly cognizable under federal law. They will not be applied retrospectively.

Perhaps, the assertion that the basic and fundamental requirements of justice and fair play called for by § 501(a) of the Act—requirements which are indeed developed but one step beyond the Seventh Commandment itself—are "newly created duties", seems startling even in our present day and age. In defense of this admitted paradox we may only point out that although the duties alleged to have been breached here have long been encompassed within the moral law, and presumably within the common law of the various states (although we would be hard pressed to substantiate this with case law in the labor field), these duties are new to *federal law*, on which the jurisdiction (and thus the sole power) of this Court to act is based. Therefore, we feel bound by the principle of statutory interpretation previously enunciated.

■ To avoid the effect of this conclusion plaintiffs' attorney has astutely advanced the somewhat novel contention that §§ 157 and 158(a) (3) of Title 29 U.S.C.A. (popularly referred to as the Taft-Hartley Act) create an independent basis for recovery in this action. Since the Taft-Hartley Act became law on June 23, 1947 it would, of course, if applicable here, dispel any problem of retrospective application. However, we are convinced that it is not applicable and that the plaintiffs' argument must fail.

Generally speaking the sections of the Taft-Hartley Act relied upon by the plaintiffs recognize under federal law the right of employees to organize unions and further makes it an unfair labor practice for an employer to discriminate in regard to the hiring or tenure of employment *except* that they may discriminate against an employee for nonpayment of union dues, (i. e., § 158(a) (3) recognizes the right of a union and an employer to enter a union shop agreement whereby a new employee must within 30 days join the union or lose his job.)

From this, plaintiffs argue that the employee under a collective bargaining agreement containing this union shop clause (which clause is contained in a great majority of Local 107's contracts) must pay dues to the union in order to retain his job *as a result of the specific command of federal law*. Having reached this point, they maintain that it necessarily follows that the union and its officers must use the dues money they thus receive by virtue of federal law to further proper union objectives and not for purely private gain. This they argue is a federally created duty concomitant with the federally created right to exact dues. To strengthen this argument plaintiffs' counsel points to a series of Supreme Court cases beginning with Steele v. Louisville & Nashville Railroad Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, and Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 1944, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, which they maintain bear out this conclusion.

In the Steele case, supra, the Brotherhood of Firemen and Enginemen was a labor organization recognized under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. as exclusive bargaining agent for all firemen on the Louisville & Nashville Railroad. The Brotherhood had entered into a collective bargaining agreement with the railroad, which contract obviously discriminated against Negro firemen. The Negro firemen brought suit. The Supreme Court reversed the state

court and *held* that the Railway Labor Act requires the union "in collective bargaining and in making contracts with the carrier, to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith." 323 U.S. at page 204, 65 S.Ct. at page 233. The Tunstall case, supra, decided the same day, added the proposition that the breach of this federally created duty justified resort to a federal court for relief. See also Syres v. Oil Workers International Union, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (his case appears to overrule Williams v. Yellow Cab Co., 3 Cir., 1952, 200 F.2d 302, which had refused to extend the reasoning of the Steele case to cases involving the Taft-Hartley Act); Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; Ford Motor Co. v. Huffman, 1953, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048; Brotherhood of Railroad Trainmen v. Howard, 1952, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; Cunningham v. Erie Railroad Co., 2 Cir., 1959, 266 F.2d 411; McMullans v. Kansas, Oklahoma & Gulf Ry. Co., 10 Cir., 1956, 229 F.2d 50.

In answer to this argument based upon the fundamental proposition that where a government confers rights upon a group (which necessarily impede to a lesser or greater degree upon the rights of other members of society) it must necessarily impose a corresponding duty upon that group to properly exercise the rights conferred, the defendants argue that (1) the very reason why Congress enacted the new Labor Management Reporting and Disclosure Act was to provide redress for the type wrongs complained of here, which wrongs were presumably not prohibited by prior federal law; (2) nothing in the Taft-Hartley Act provides for jurisdiction in this type of action, and there is not the slightest intimation in either the legislative history of that Act or in its subsequent enforcement in the courts, which would indicate that it was intended to regulate the collection or spending of union dues;

(3) rather than confer the right of unions to make security agreements with an employer which would compel a worker to join a union, the act restricted the union in such matters and in this respect differs from the Railway Labor Act; and (4) at any rate, the Taft-Hartley Act sets up a structure for the solution of federal disputes within the *exclusive* jurisdiction of the National Labor Relations Board, rather than with the federal courts.

We are not convinced that these arguments are a sufficient answer to the plaintiffs' contention, although we are not in complete disagreement with the defendants on any one of them. The fact that Congress may not have believed that prior federal law prohibited the type activity here complained of, is far from conclusive on the question of whether the Taft-Hartley Act does in fact afford such protection. That question is for a court of law. Nor does the fact that no one since the enactment of the Taft-Hartley Act has advanced the theory now pressed so ably and sincerely by counsel for the plaintiffs, convince us that their argument must fail. We have not yet completely abandoned the concept of a "legal pioneer" or what at first glance might be labeled a "wild theory".

Defendants third argument (i. e., that the Taft-Hartley Act did not *confer* any right to collect dues, since the unions had this right and indeed exercised it more zealously in many instances, prior to that law's enactment) we find more persuasive. Nevertheless, we will not rest our rejection of plaintiffs' argument solely upon this ground or upon defendants' argument concerning the N.L.R.B.'s exclusive jurisdiction.

Leaving aside for a moment the case of Railway Employes' Dept. Am. Federation of Labor, International Ass'n of Machinists v. Hanson, 1956, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112, and the case of International Association of Machinists v. Street, 1959, 215 Ga. 27, 108 S.E.2d 796 probable jurisdiction noted, 1959, 361 U.S. 807, 80 S.Ct. 84, 4 L.Ed. 2d 54, cited in the last section of plain-

tiffs' brief, the Steele case and all of those following it which the plaintiffs have cited, deal with problems arising *directly* out of the union's activity in the process of collective bargaining, (i. e., most of them involved actions to declare discriminatory collective bargaining agreements void). The Steele case, which is the prototype of this line of cases, was decided by the Supreme Court upon an interpretation of the specific language of the Railway Labor Act. They interpreted the word "represent", used in the Act, to mean "represent fairly" and that the Act thus prohibited discrimination *in collective bargaining activity*—the very subject which both the Railway Labor Act and the Taft-Hartley Act purport to regulate. Nowhere in their complaint do the plaintiffs allege that Local 107 has in any way discriminated against them in its collective bargaining activity. On the other hand, the Taft-Hartley Act nowhere attempts to regulate the *use of union funds*. Because of this important distinction, we feel that the holding in this line of cases is not applicable here.

Indeed, in the Steele case itself, the facts recited by the Supreme Court would appear to bear out this distinction. Thus, although it was careful to point up the numerous rights which the Railway Labor Act bestowed upon the union (including the right to act as *exclusive* bargaining representative), the Court found no violation of any federal duty in the union expressly excluding negroes from its membership. By inference, the Court appeared to concede the fact that so long as the union represents these men fairly in collective bargaining, there could be no complaint based upon federal law. If the plaintiffs' broad thesis of rights attended by commensurate duties were applied there, such discrimination would seem to violate the federal act which conferred *exclusive* bargaining rights upon that union.

In pointing up this distinction we do not mean to infer that this line of cases

has no bearing at all here. In certain instances their language does add weight to the plaintiffs' argument. Thus the Supreme Court in the Steele case, by way of dictum, stated that if the Railway Labor Act were construed to confer these numerous powers upon a bargaining representative of a craft without imposing *any* commensurate statutory duty toward its members, "constitutional questions arise". 323 U.S. at page 198, 65 S.Ct. at page 230, 89 L.Ed. 173. This is the reasoning which plaintiffs would have us apply in our case. But even assuming that the Supreme Court had held in the Steel case that the duty to represent all members of a craft fairly in collective bargaining was a duty which the due process clause of the Constitution itself required,[3] this is not to say that the Taft-Hartley Act would violate due process if it were not found to impose a specific duty upon a union to spend its money *solely* for collective bargaining purposes.

This brings us to the Hanson case. The plaintiffs in that case attacked the 1951 "union shop" amendment to the Railway Labor Act, requiring an employee to become a member of the union which was the certified representative for his craft, within 60 days after a collective bargaining agreement containing a "union shop" clause went into effect. If an employee refused to join, he would lose his job. The plaintiffs argued that to require an employee to pay dues to a union in order to keep his job is to force him to contribute financially to ideas he did not necessarily believe in, and therefore violated his rights under the First Amendment. The argument was rejected by the Court and thus cannot be directly relied upon by the plaintiffs. Nevertheless, plaintiffs maintain that the language used by Justice Douglas in reserving the question of whether a union member could object to the expenditure of union funds for ideological purposes to which they were strongly opposed, clearly in-

---

**3.** That the Court did not decide the Steele case upon such a constitutional ground appears evident from a reading of Mr. Justice Murphy's concurring opinion.

dicated that dues money taken by a union under a union shop contract must be used for purposes germane to collective bargaining, and for no other purpose. The specific question of whether such money can be used for *political purposes* is presently before the Supreme Court, see International Association of Machinists v. Street, supra.

■ Before passing upon the plaintiffs' reliance upon the dictum in the Hanson case, it is important to understand the reach of their argument. If accepted, it would create federal jurisdiction in every suit wherein a single union member alleged that a particular union expenditure was made for a purpose not germane to collective bargaining. It is submitted that such a sweeping expansion of federal jurisdiction is not justified by a proper interpretation of the Taft-Hartley Act or the Railway Labor Act. To say that by enacting these laws Congress intended to open the federal courts to such a vast area of litigation does not appear to us well-founded and, as defendants point out, no such jurisdiction has been recognized in the many years that these Acts have been in existence. It would appear that so long as a union performs its purpose of representing the employee in a fair and reasonable way in its collective bargaining capacity, the fact that they may incidentally spend union moneys for a noncollective bargaining purpose affords no right of action under §§ 157 or 158(a) (3) of the Taft-Hartley Act. If such expenditures should reach the point where they actually interfere with such fair and reasonable representation in collective bargaining, a different question might arise.

■ As to plaintiffs' "due process" argument which is somewhat analogous to the First Amendment argument left open in the Hanson case, the denial of the right which the plaintiffs assert here (i. e., the right of a union member to *come into a federal court* and force a union to limit its expenditures solely to collective bargaining purposes) does not in our opinion violate that concept as we interpret it. So long as that federal law which strengthens the union's bargaining power, in turn sees to it that that power is used fairly in reaching collective bargaining agreements, it would not appear to violate basic motions of justice and fair play. Plaintiffs are not without a remedy in this type situation. The state courts have recognized a duty on the part of a union to act only in accordance with its constitution and bylaws. See citations and discussion infra, at page 618 of 182 F.Supp. Moreover, the new Labor Management Reporting and Disclosure Act of 1959 offers further protection in such matters. There appears to be no reason for us now to attempt to stretch the provisions of the Taft-Hartley Act to cover such a situation. As we have pointed out already, we neither feel that the Constitution requires us to do so nor that a fair interpretation of the Taft-Hartley Act permits us to do so.

Happily we need not base our opinion solely upon constitutional grounds. There is a more obvious reason why the plaintiffs' theory is of no avail here. The rights which § 158(a) (3) of the Taft-Hartley Act confer, as well as the corresponding duties imposed by it (whatever we might hold them to be) are rights and duties conferred upon the collective bargaining unit, i. e., *the union.* They are not conferred upon the individual officers of that union. Therefore, the plaintiffs really must argue that a federal law which confers numerous rights upon a *union,* must necessarily impose strict duty upon its *individual officers* not to spend the union's money for noncollective bargaining purposes. This does not follow. The language in the opinions relied upon by the plaintiffs speak in terms of the "duty of the union". Yet the whole tenor of the plaintiffs' complaint makes it evident that this suit is against the individual officers of Local 107 and not against the union. In their brief in opposition to Local 107's motion to intervene, the plaintiffs specifically state that "The Union itself * * * has no standing as a party litigant" since the plaintiffs appear as trustees ad litem for the union.

Nor do we view this as a mere technicality which has been corrected by the Court's Order allowing the union to intervene as a party defendant. It is evident that the plaintiffs' claim here is not against the union. The acts complained of were not acts of the union done on its behalf by an acting officer. If anything, they are acts done in flagrant breach of duty. If they were in fact done, they were done for the defendants own personal gain *at the expense of the union.* In such a suit against private individuals, the Taft-Hartley Act clearly does not confer federal jurisdiction.

From what has been said above, the Court holds that the statute may not be applied retroactively and that the complaint has not stated a cause of action under the provisions of the Taft-Hartley Act. Putting aside temporarily the question of injunctive relief as to expenditure of union funds for legal fees in suits now pending against the defendants, it would appear that the remainder of the action should be dismissed unless the complaint states a cause of action arising out of events subsequent to the effective date of the Act. Since one of the defendants, Benjamin Lapensohn, has had no connection with the union since 1957 and the injunction in no way involves him, it follows that the action as to him must be dismissed. As to the remaining defendants, officers and/or trustees of the local, while the complaint in general language alleges continuing misdeeds, it fails to set forth any specific act of commission or omission which occurred subsequent to the effective date of the Act.

If the only matter before the Court were the motion to dismiss discussed above, the Court might be disposed to grant the motion. However, there is another facet to the case which prevents the dismissal of the action. That facet relates to the motion for a preliminary injunction to prohibit the defendants from using union funds to defray the expense of legal fees in civil and crim-

inal actions which have been brought against them in the Courts of Pennsylvania as well as to defray legal costs of the present action. The charges in those cases, in essence, grow out of alleged misappropriation of funds by the officers,[4] and the plaintiffs maintain that such expenditures are in violation of the fiduciary duties imposed upon officers of a labor union by Section 501(a) of the Act, supra, and that unless such expenditures are enjoined the union will suffer irreparable harm thereby.

### Motion For Injunction

Shortly after the effective date of the Act and the institution of suits, criminal and civil, in the local Courts against the defendants, the union at a regular monthly meeting, with few dissenting votes, adopted a resolution authorizing the union to bear "Legal costs of such actions [against the officers] which are in reality not directed at our officers but are directed at us, the members of Local 107, our good contracts, our good wages and our good working conditions."

The question, therefore, which faces us is: Does the expenditure of union funds to pay for legal fees in the defense of both criminal and civil actions brought against the various defendant officers for an alleged conspiracy to cheat and defraud their union of large sums of money constitute a breach of that fiduciary duty imposed upon them by Section 501(a), supra, notwithstanding the purported authorization of such expenditures by a resolution of the union membership passed at a regular union meeting?

At the hearing on the preliminary injunction, it was brought out that within the limit of some four or five weeks after the adoption of the resolution the union, pursuant to the resolution, paid upwards of $25,000 to the attorneys representing the defendants. It is also clear that counsel for the union has advised the officers that such expenditures are proper. We are, therefore, with the payment of those large sums of money already ac-

---

4. See Stipulation of counsel and in particular Exhibit G of the stipulation for the various complaints which have been lodged against the defendants.

complished and threatened further payments about to occur, in a position factually to pass upon the merits of the plaintiffs' contention.[5]

At the outset of our discussion of this question it is necessary to make several general observations as to the construction to be given this new and far-reaching Act of Congress. We do so with caution, aware of the importance of this new legislation in the labor field and of the far-reaching effect which initial judicial interpretation of this Act must necessarily have upon its future.

The purpose of this Act is no secret. It was enacted "to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives which distort and defeat the policies of the Labor Management Relations Act, 1947." § 2(c). It came on the wake of Congressional findings of crime and corruption in the labor and management field § 2(b).

▆ Section 501, with which we are particularly concerned, is entitled "Fiduciary responsibility of officers of labor organizations." This section, quoted earlier, attempts to define in the broadest terms possible the duty which the new federal law imposes upon a union official. Congress made no attempt to "codify" the law in this area. It appears evident to us that they intended the federal courts to fashion a new federal labor law in this area, in much the same way that the federal courts have fashioned a new substantive law of collective bargaining contracts under § 301(a) of the Taft-Hartley Act, 29 U.S.C.A. § 185(a). See Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972. In undertaking this task the federal courts will necessarily rely heavily upon the common law of the various states. Where that law is lack-

ing or where it in any way conflicts with the policy expressed in our national labor laws, the latter will of course be our guide.

We turn then to Section 501, not expecting to find a detailed command or prohibition as to the particular act complained of, but rather to find a general guide which, properly developed, will lead us to an answer. We feel that that answer here must be in plaintiffs' favor.

In determining whether or not the expenditures now sought to be enjoined violate the fiduciary responsibility of an officer of a labor organization we must necessarily determine the legal effect of the September 20th Resolution. This goes to the heart of the present problem and appears to be the main ground on which the defendants seek to avoid the injunction.

The plaintiffs assert that the Resolution authorizing such expenditures is encompassed within the express prohibition of § 501(a) against any "general exculpatory resolution". Although not expressly purporting to absolve the defendants of guilt, plaintiffs argue that the Resolution *in effect* does just this. Unfortunately the Act does not define the phrase "general exculpatory resolution".

The defendants take issue with the plaintiffs' interpretation. They maintain that the Resolution should be taken at face value, i. e., as a pledge of the union's faith in their officers and a pledge of financial aid to defend suits which are in reality directed at the union movement. They point to several remarks made in Congress which make it clear that this provision was not intended to restrict in any way the right of the membership to give a grant of authority—which they allege is all that the September 20th Resolution does.

▆ A plain reading of the last sentence in § 501(a) leads me to agree with

---

5. There has been no showing on the part of the defendants, nor was it argued in defendants' brief, that defendants are responsible persons who would be able to reimburse the union for funds expended in their behalf. The sums involved are

neither nominal nor minimal and in the circumstances the Court holds that a showing of irreparable harm (assuming the illegality of the payments) has been established.

the defendants, at least in their conclusion. On the other hand, it is not necessary for a resolution to read "The officers are hereby absolved of all responsibility created by the Act" before a court will strike it down as "exculpatory" under § 501(a). Nor must a court accept at face value the stated purpose of a resolution when reason and common sense clearly dictate a different purpose. Nevertheless in my interpretation of § 501 (a), the Resolution under discussion is *not* one "purporting to relieve any [officer] of liability for breach of the duties declared by this section * * *."

We must distinguish between a resolution which purports to *authorize* action which is beyond the power of the union to do and for that reason in violation of § 501(a) when done by an officer (such as the present Resolution) and a resolution which purports to *relieve* an officer of liability for breach of the duties declared in § 501(a). At times this distinction may be a fine one. Very often the result will be the same. Nevertheless we feel that such a distinction should be made here unless the "exculpatory" provision is to be read as a mere "catchall" phrase.[6]

We turn then to the question of whether the September 20th Resolution is valid, i. e., conforms with the law of Pennsylvania and the Federal Labor laws. See International Union of Operating Engineers, A.F.L.-C.I.O. v. Pierce, Tex.Civ. App., 1959, 321 S.W.2d 914, at page 917–918. If it is inconsistent with either, we think it follows that the present expenditures by the defendants violate that provision in § 501(a) which imposes upon them a strict duty to "expend [union funds] in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder * * *."—since we read this sentence to authorize only those expenditures made pursuant to a *lawful* bylaw or resolution.

Unfortunately there is a dearth of Pennsylvania case law on the question of limitations on union expenditures or the corresponding rights of a dissenting union minority. Unlike the analogous doctrine of *ultra vires* acts in the corporate field, the courts have been reluctant to interfere in the internal affairs of a union. Underwood v. Maloney, D.C.E.D.Pa. 1957, 152 F.Supp. 648. Nevertheless the principle of majority rule is not *absolute* in an unincorporated association such as a union. West Virginia Pulp & Paper Co. v. Lewis, 1958, 17 Misc.2d 94, 191 N.Y.S.2d 303, 8 A.D.2d 899, 187 N.Y.S. 2d 1002. This follows from the fact that each member has a property interest in the assets of the union, and in addition has a contractual right (viewing the constitution, bylaws and resolutions as creating a contractual relationship between the organization and the membership, Williams v. Masters, Mates and Pilots of America, 1956, 384 Pa. 413, 120 A.2d 896), to have the assets of the union used only for the purposes for which the union was organized. Maloney v. United Mine Workers of America, 1932, 308 Pa. 251, 162 A. 225; Leatherman v. Wolf, 1913, 240 Pa. 557, 88 A. 17; Beasley v. Allyn, 12 W.N.C. 90; Bacon v. Paradise, 1945, 318 Mass. 649, 63 N.E.2d 571, 167 A.L.R. 1227; Guy Le R. Stevich, Unincorporated Associations, (1889) pp. 56, 57; 21 Pennsylvania Law Encyclopedia, Labor § 236.

The defendants argue that this Court is precluded from passing upon the merit or propriety of the Resolution in question. With this we agree. But there is a distinction between the merit of a resolution and its legality. The latter question is peculiarly within the competence of a court to pass upon and can not be abandoned finally to the organization. Maloney v. United Mine Workers of America, supra; Gordon v. Tomei, 1941, 144 Pa.Super. 449, 19 A.2d 588.

6. We might point out in this regard that the original Senate version of the Act (i. e., The Kennedy-Ives Bill, S.Rep. No. 187, 86th Cong., First Session, 1959) contained a somewhat similar prohibition against any exculpatory resolution and *also* contained a clause prohibiting unions from paying the legal fees or fines of any person indicted or convicted of a violation of the Bill.

When a serious question arises as to whether a particular act is within the legitimate aims and purposes of a labor union as expressed by its constitution and bylaws, the Court must ultimately resolve the matter so as to preserve on the one hand the rights of the union and on the other those of the individual members of that union. Maloney v. United Mine Workers of America, supra.

In answering this question of whether an act is ultra vires, we look first to the Constitution of Local 107.[7] Article I, Section 2, sets forth the "objectives" of the organization in broad terms. These objectives might be summed up as an effort to organize workmen, to educate them, to improve their condition and to improve the industry in which they work. The defendants pointed to no more specific provision in the constitution (nor can we find any) which would authorize the type of expenditure dealt with here.

 It is true that from the general objectives and purposes of a particular trade union, certain ancillary powers reasonably necessary for their attainment may be implied. In determining whether a particular act falls within this admittedly broad latitude of action, the Court must take into consideration all of the factors surrounding it, i. e., the stated purpose of the action, its immediate effect, its possible future benefit to the union, etc. This is necessary in order to determine whether the union, in light of the authority derived from its constitution, has a sufficient interest in the action to empower it to so act. If it has, a court of law will not interfere regardless of the wisdom or propriety of the act. If it has not, a court of law must intervene at the behest of a single union member. Maloney v. United Mine Workers of America, supra; Weiss v. Musical

Mutual Protective Union, 1899, 189 Pa. 446, 42 A. 118; Leatherman v. Wolf, supra; West Virginia Pulp & Paper Co. v. Lewis, supra; Bacon v. Paradise, supra.

In passing upon the question of whether a union has sufficient interest in criminal and civil suits brought against various officers for the theft of union funds, to spend large sums of its money on legal fees for those officers, the Court is admittedly without a Pennsylvania case directly on point. There are, however, two interesting English cases which passed upon a similar question and which held that such expenditures were beyond the power of a union to make. Alfin v. Hewlett, 18 T.L.R. 664 ( ); Orman v. Hutt, 1 Ch. 98 (1914) (c. a.). These cases are persuasive.

Furthermore we feel that those cases involving the use of corporate funds to pay for the defense of officers charged with misconduct in office are helpful. Although this question again has not been passed upon in Pennsylvania, several other jurisdictions when faced with the problem have concluded that such expenditures are improper.[8]

In the case of Jesse v. Four-Wheel Drive Auto Co., 1922, 177 Wis. 627, 189 N.W. 276, the Supreme Court of Wisconsin held that such expenditures could only be authorized by a unanimous vote of the membership. See also In re E. C. Warner Co., 1950, 232 Minn. 207, 45 N.W.2d 388; Solimine v. Hollander, 1941, 129 N.J.Eq. 264, 19 A.2d 344; New York Dock Co., Inc. v. McCollom, 1939, 173 Misc. 106, 16 N.Y.S.2d 844; Corporate Responsibility for Litigation Expenses of Management, 40 Cal.L.Rev. 104 (1952); Washington, Litigation Expenses of Corporate Directors in Stockholder's Suits, 40 Col.L.Rev. 431 (1940).

7. The only constitution under which Local 107 operates is that of the International Union. Moreover they have no bylaws.

8. In this regard, it is interesting to note that very recently the Pennsylvania Legislature passed a bill empowering a corporation to indemnify directors, officers and others against expenses in suits brought against them "by reason of being or having been directors or officers * * * of the corporation" *except* where he is adjudged liable for negligence or misconduct in performance of his duty. Act of April 18, 1945, P.L. 253, as amended October 13, 1959, 12 P.S. § 1324.

The only interest which Local 107 (as an organization dedicated to the objectives stated in its Constitution) would appear to have in the civil and criminal actions against these officers is an interest (1) in not losing the services of their officers (whom we must presume are competent) simply because someone wrongfully accuses them of misconduct, or (2) in not having men closely associated with their union (whose conduct somewhat reflects upon the union) convicted of serious wrongs when they are not in fact guilty of these wrongs, or (3) not having officers in their union accused of serious wrongs by antiunion people, simply because they are officers of a union.

Assume for a moment that one of these officers was accused of evasion of personal income taxes, would not Local 107 have exactly these same interests in the outcome of such a suit? If in such a situation, a majority of the union were to pass a resolution affirming their confidence in that officer and asserting herein that the action by the United States was in reality an attempt "to break up and destroy our union" [and therefore] be it resolved that Local 107 go on record to help our [officer] in every way possible in [this] court [matter] by having Local 107 bear the legal costs of such actions which [is] in reality not directed at our [officer], but [is] directed at us, the members of Local 107, our good contracts, our good wages, and our good working conditions", a proper court of law upon an objection by a union member would independently pass upon the power of Local 107 to so spend its money, and even presuming the good faith of the membership in passing such a resolution, would properly enjoin the expenditure as outside the legitimate aims and purposes of Local 107 as expressed in its Constitution.

In light of the foregoing and upon consideration of the situation surrounding the present expenditures, in particular the nature and seriousness of the charges brought against the defendants by the State of Pennsylvania as well as by individual members of their union, the Court feels that such expenditures to pay for the legal expenses incurred by the defendant officers in the criminal and civil suits brought against them individually are expenses to be borne by the officers themselves and are beyond the power of Local 107 to make. Being beyond the powers of the union as derived from its Constitution, it follows that a mere majority vote at a regular union meeting can not authorize such expenditures. West Virginia Pulp & Paper Co. v. Lewis, supra.

There are undoubtedly situations in which a suit against a union officer would have a direct and injurious effect upon the union itself or would in reality be directed at the union. In such a situation the union would have the power to lend its financial support to such officer. When the question of whether the union has a sufficient interest to spend large sums of money to defend such a suit arises, it must ultimately be resolved by the court. Although a court will allow wide latitude to those in control of the union, it can not, by allowing unlimited latitude, abandon the right of a minority to see that the union spends its monies in accordance with its lawful aims and purposes as expressed in its Constitution and bylaws. Particularly is this true today, when the voice of the individual employee in fixing his own wages, hours and working conditions has necessarily been surrendered to the voice of the collective bargaining unit.

There is a further reason why the present Resolution is no defense here. Aside from its validity under Pennsylvania law, it is inconsistent with the aims and purposes of the Labor Management Reporting and Disclosure Act and violates the spirit of that Act. A stated purpose of the Act is "to *eliminate* * * improper practices on the part of labor organizations * * * and their officers". (Emphasis added). To allow a union officer to use the power and wealth of the very union which he is accused of pilfering, to defend himself against such charges, is totally inconsistent with Con-

gress' effort to eliminate the undesirable element which has been uncovered in the labor-management field. To allow even a majority of members in that union to authorize such action, when, if the charges made against these defendants are true, it is these very members whom the officers have deceived, would be equally inconsistent with the Act. If some of those members have not been deceived by the defendants, but because of the immediate gains in their income and working conditions which Local 107 has won for them, they are content to accept as officers anyone who produces immediate results, regardless of what other wrongs those officers may commit in so doing, this Court would still not feel constrained to bow to their will in the light of its duty both to those members of Local 107 who place honesty above material gain as well as to the millions of others in the labor movement whose cause would be seriously injured by such an attitude.

Although we have not attempted to treat defendants' arguments individually, since we feel they are satisfactorily answered in this opinion, something should be said concerning their argument that the plaintiffs are here asking us to do that which Congress specifically refused to do when it failed to adopt Subsection 107(b) of the original Senate version of the Labor Bill (The Kennedy-Ives Bill), which specifically prohibited "both unions and employers from directly or indirectly paying or advancing the costs of defense, of any of their officers * * who [are] indicted for * * * any violation of any provision of the Bill." S.Rep. No. 187, 86th Cong., First Session, 1959, U.S.Code Cong. and Adm. News 1959, p. 2318.

We are familiar with this argument in statutory construction. Although the value of such reasoning to discover the "intent" of Congress is often questionable, we can not of course ignore it, particularly in light of several Supreme Court rulings referred to by the defendants. Manhattan Properties, Inc. v. Irving Trust Co., 1934, 291 U.S. 320, 54 S.Ct. 385, 78 L.Ed 824; Duplex Printing Press Co. v. Deering, 1921, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed 349; Pennsylvania Railroad Co. v. International Coal Min. Co., 1913, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed 1446. Nevertheless there are reasons why we are not persuaded by their argument here.

First, the language contained in the Kennedy-Ives Bill is much broader than our holding in the present case. It is essential to an understanding of our position in this case that this point be made clear. That section quoted above would foreclose financial aid by the union to an officer in suits under the Act, under *any* circumstances. In our case we have expressly limited our holding *to the facts before us*. In the light of all of these facts we do not feel that the several actions brought against the defendants involve any question of sufficient interest to Local 107 to warrant their expending large sums of union money to pay the legal costs of the defendants in these suits. That Congress refused to foreclose the right of a union under *any* circumstances to lend financial aid to an officer when sued under any section of the Kennedy-Ives Bill is not, we feel, a strong argument for the conclusion that under *no* circumstances could a union be prohibited from lending financial aid to an accused officer.

Second, in none of the cases cited by the defendants to support their argument as to the conclusion to be drawn from the omission of Section 107(b) were there two distinct bills involved. Here the Act finally passed by Congress (with modification) was the Landrum-Griffin House Bill and not the Kennedy-Ives Senate Bill. Strictly speaking, the Conference Committee did not amend the final Bill as to the provision in question, since it was never contained in it to begin with. Had the Kennedy-Ives Bill ultimately been adopted with Section 107(b) deleted, the defendants' argument would be more convincing.

Finally, even assuming that Congress intended to leave a union free to use its funds for the purpose of paying its offi-

cers legal expenses in actions brought against them under the new Act, if under the law of Pennsylvania, the state in which the union membership contractual relationship arose, such expenditures are illegal, a union officer could not consistent with his duty to the union (which duties ultimately flow from its Constitution) expend union funds for this purpose. This would follow unless we interpret the omission of this prohibition as creating an affirmative federal right in a union to so spend its funds, which right is intended to supersede any state law to the contrary. We flatly reject such an interpretation of the new Act.

### Conclusion

At the time that permission was granted to the plaintiffs to file their complaint pursuant to § 501(b) of the Act (see our Order of November 12, 1959), we specifically refused to pass upon the validity of any of the legal arguments raised by the defendants. Since the reasonable time requirements of § 501(b) were clearly met as to at least one phase of the complaint,[9] and there appearing to have been "good cause" shown by the plaintiffs for filing suit, the Court permitted the complaint to be filed.[10]

However, since that time we have had the benefit of extensive legal arguments on the merits of the action and as a result have reached the conclusions above set forth with regard to the retrospective application of the Act. In view of these conclusions, which in effect result in stripping plaintiffs' complaint of all but those few paragraphs which state in general terms that the defendants' unlawful activities are continuing to the present time, we are compelled to order the plaintiffs to amend their complaint to state specific acts of misconduct in violation of § 501 which have occurred *subsequent* to September 14, 1959 and which the union upon request has failed within a reasonable time to answer or otherwise correct. In the event that the plaintiffs fail to so amend within a time to be set in our order, their complaint will be dismissed with prejudice, excepting from such dismissal, of course, that part of their complaint which deals with the injunction discussed above.

A formal order will be entered enjoining the defendants from expending union funds for the defense of the cases presently pending against the defendants in either the Courts of the Commonwealth of Pennsylvania or in this Court. This ruling in no way attempts to pass upon the question of whether or not Local 107 may with propriety, by appropriate resolution, reimburse its officers for their legal expenses in the event they are exonerated from any wrongdoing in connection with the handling of union funds involved in the actions presently pending.[11]

9. The union has from the outset taken the position that expenditures for counsel fees are proper in light of the Resolution. Therefore, no purpose would be served by further delay in this matter and the "reasonable time" requirement in § 501(b) was met.

10. Although the Act does not specify what is meant by "good cause" in § 501(b), it would appear that such a preliminary requirement is intended as a safeguard to the union against harassing and vexatious litigation brought without merit or good faith. The fact that permission to file the complaint can be granted after an *ex parte* hearing would seem to support this view. The Court believed that the present suit satisfied this basic requirement.

11. See footnote (8), supra.